**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FINASTRA TECHNOLOGY, INC.,

            *Plaintiff*,

   v.

THE NORTHERN TRUST COMPANY,

             *Defendant*.

Case No. 24-cv-_____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Finastra Technology, Inc. ("Finastra") brings this complaint for injunctive and monetary relief against Defendant The Northern Trust Company ("Northern Trust"), and alleges as follows:

**NATURE OF THE ACTION**

1. Finastra brings this action to prevent, and recover for, Northern Trust's ongoing and flagrant unlicensed use of Finastra's copyrighted software.

2. Finastra is a financial technology company that develops, produces, distributes, and licenses a range of copyrighted software applications to banks and other financial services providers across the world. Through enormous investments of money and time, and exceptional engineering efforts, Finastra has built a suite of products through which it serves around 8,100 customers across 130 countries, including forty-five of the world's top fifty banks.

3. Among Finastra's proprietary software products is its Midas Release 4 enterprise banking software (the "Midas R4 software" or the "Software"). The Midas R4 software is a core banking system solution that provides functionality for key banking operations, including financial control, foreign exchange, treasury operations, funds transfer, payment settlements,

lending, dealing, securities, money market, retail, cash management, and data management and reporting.

4.    Northern Trust is a former licensee of Finastra's Midas R4 software.

5.    This dispute arises from Northern Trust's willful infringement—both historical and ongoing—of Finastra's copyrights in its Midas R4 software, and the probable destruction of information related to its infringing use that would be critical to establishing the damages that Finastra is owed.

6.    Northern Trust's most recent license to use the Software expired on December 31, 2023.  Over the preceding several months, the parties discussed—and Northern Trust acknowledged—the pending expiration of its right to use the software.  Northern Trust communicated its interest in renewing its license and requested a renewal quote.  Ultimately, the parties were unable to reach agreement on the terms of a new license.

7.    Rather than terminate its use of the software, however, Northern Trust has simply continued to use the software without a license, flagrantly infringing Finastra's copyrights and daring Finastra to file a lawsuit.

8.    But Northern Trust's infringement goes well beyond that.  The pricing for Finastra's Midas R4 software licenses depends on two distinct measures of software usage:  (1) the number of software installations on the underlying system architecture, and (2) the volume of transactions processed, under a volume-based pricing ("VBP") matrix.  On October 13, 2023, as the parties sought to negotiate the terms of a new license, Finastra requested information about Northern Trust's usage of the Software to establish the appropriate pricing going forward for a proposed renewal.  To Finastra's surprise, Northern Trust's responses revealed that, while

Northern Trust's license permitted the operation of only three installations, Northern Trust had been operating an additional *thirty-seven* unlicensed installations of the software.

9.      In light of Northern Trust's substantial unlicensed use of the software, Finastra has since sought to audit the volume of Northern Trust's historical usage and determine whether Northern Trust exceeded the volume for which it was licensed.  Even Northern Trust's partial disclosures to date reveal that throughout 2023 and until its license expired, Northern Trust exceeded the volume for which it was licensed, processing transactions at a volume corresponding to VBP level 17 when it had paid only for a VBP level 14 license.

10.      In short, Northern Trust infringed Finastra's copyrights in its Midas R4 software *during* the license term by using the Software in gross excess of the scope of the license and continues to infringe through its ongoing use of the software *after* the license term has ended.

11.      Finastra is not the only party harmed by Northern Trust's unlicensed use of the software, however.

12.      As a regulated banking entity, Northern Trust is subject to various regulatory requirements designed to ensure the soundness and safety of the banking system.  Those concerns extend to the software that Northern Trust uses; indeed, as a provider of sophisticated software relied on by the banking community, Finastra itself is a Significant Service Provider (or "SSP") and is subject to regulation by the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Office of the Comptroller of the Currency under the Bank Service Company Act, 12 U.S.C. § 1861 *et seq*.

13.      Northern Trust's license included both the right to use the copyrighted software, as well as a right to ongoing software maintenance and support from Finastra—support designed

to remediate vulnerabilities or defects, ensure the smooth operation of the software on which the bank relies, and avoid risks to the safety and soundness of Northern Trust's banking operations.

14.    Northern Trust's unlicensed use of the Software, however, means that it is also *entirely unsupported* in its use, including but not limited to support for any operational vulnerabilities or defects that may arise, among other potential issues, and as such necessarily jeopardizes the safety and soundness of the bank and its customers' deposits.

15.    Significantly, Northern Trust is actively working to eliminate the record of the scope of its unlicensed use of the software.  Northern Trust has represented to Finastra that it is actively working to transition off the Midas R4 software and intends to substantially complete that transition at some point in the first half of 2024.  Finastra agrees that Northern Trust's unlicensed use of the Software must cease.  But Northern Trust has refused to comply with Finastra's demands that Northern Trust preserve, and provide Finastra with a record of, (i) all of its installations of the software and (ii) the volume of use at each.  Northern Trust's plan to eliminate its unlicensed software installations without providing all of the audit information that Finastra has requested means that there will be no record of the two criteria that are essential to calculating Finastra's damages from Northern Trust's historical and ongoing infringement.

16.    In short, Northern Trust is attempting to run out the clock, hoping that Finastra cannot obtain judicial relief until it is too late to reliably calculate Finastra's damages, thereby rendering the prospect of monetary relief illusory.

17.    Accordingly, Finastra brings this action for an order enjoining Northern Trust's ongoing unlicensed use of Finastra's software, and for the substantial damages from such use.

## JURISDICTION AND VENUE

18.    This is a civil action in which Finastra seeks damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*, trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and related claims under New York law.

19.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) over Finastra's copyright infringement and federal trade secret misappropriation claims, and both supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over Finastra's related state-law claims.

20.    Northern Trust is subject to personal jurisdiction in this Court pursuant to N.Y. C.P.L.R. § 302(a)(l), because it consented to personal jurisdiction in New York in License Extension and Amendment Agreement Number ON205793, dated January 10, 2022 (the "January 2022 License Agreement") (attached as **Exhibit 1**).

21.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) and the January 2022 License Agreement because Northern Trust is subject to personal jurisdiction in this Court and there is no other district in which an action may otherwise be brought as provided in 28 U.S.C. § 1391.

## PARTIES

22.    Plaintiff Finastra Technology, Inc. is a New York corporation with its principal place of business at 744 Primera Boulevard, Suite 2000, Lake Mary, Florida, 32746.

23.    Defendant The Northern Trust Company is an Illinois corporation with its principal place of business at 50 South La Salle Street, Chicago, Illinois, 60603.

**FACTS**

***Finastra's Midas line of banking software***

24.     Since 1975, Finastra's Midas line of proprietary enterprise banking software has provided banks with the functionality to operate various core banking systems.

25.     In 2000, Finastra, then known as Misys International Banking Systems Inc., launched the Midas Release 4 enterprise banking software, which provides an international banking software solution, including functionality for financial control, foreign exchange, treasury operations, funds transfer, payment settlements, lending, dealing, securities, money market, retail, cash management, and data management and reporting.

26.     Finastra owns the copyright to and in the Midas R4 software and to various underlying components of the Software, including the proprietary database tables in which customers may store various forms of data.  Finastra first published the copyrighted Software in 2000, and registered the copyright with the U.S. Copyright Office effective March 11, 2024 (registration no. TX009368682).

27.     The Midas R4 software also contains trade secrets in the form of its source code, scripts, and the structure and definition of its database tables; proprietary real-time and batch processing methods to perform the Software's various operations; the screens and reports that the Software creates; and the guides, manuals, and training documentation associated with the Software.

28.     Finastra licenses the Software to banks, charging a fee for each distinct installation of the Software on the underlying system architecture, as well as a fee that turns on the volume of transactions that the licensee wishes to process using the Software.

29.     Northern Trust has used and continues to use Midas R4 as a core banking system to run its general ledger, foreign exchange, money market, loans, and retail operations.

30.     Since the launch of Midas R4 in 2000, Finastra has developed and introduced refreshed versions of the Midas line of software, including Fusion Midas.

***Northern Trust's original license to use the Midas R4 software***

31.     Northern Trust licensed an earlier Midas software product, Midas DBA 2, from Finastra, then known as Midas-Kapiti International Inc. ("Midas-Kapiti"), under Agreement Number LNYC970018, dated August 22, 1997 (the "1997 License Agreement") (attached as **Exhibit 2**).

32.     Northern Trust originally obtained a license to use the Midas DBA 2 software under Section 3 of the 1997 License Agreement, as amended by Agreement Number VNYC970018, also dated August 22, 1997 (the "1997 Variation Agreement") (attached as **Exhibit 3**).  This license was a perpetual license, i.e., without a fixed term, subject to termination on the terms set forth in the parties' agreements as amended or superseded from time to time.

33.     The pricing for Midas software licenses is based on two distinct measures of software usage:  (1) the number of software installations on the underlying system architecture, and (2) the volume of transactions processed, under a VBP matrix.

34.     The 1997 License Agreement expressed Finastra's diligence in protecting its copyrighted Midas software and the trade secrets contained therein.  Under Section 4.1, Northern Trust agreed that it "shall provide the Environment" and that "[o]peration of the System and the computer installation upon which it runs shall be directly controlled, managed and resourced by Client [i.e., Northern Trust] and not contracted to a third party."  **Exhibit 2** at 2.  Under Section 10.1, Northern Trust agreed that it "shall not decompile or disassemble the System or reverse

compile, reverse assemble or reverse engineer the System from object code into source code (or attempt, authorize or permit the same) in any manner or for any purpose whatsoever without the Company's prior written consent which shall not be withheld where to do so would constitute a breach of any applicable legislation or regulations having the force of law." **Exhibit 2** at 5. And under Section 10.2, Northern Trust agreed that it "shall inform the Company promptly of any unauthorized use of the System or any infringement of the copyright or know-how and/or other proprietary rights relating to the System which shall come to its knowledge and shall, at the Company's expense, provide the Company with all reasonable assistance in any suit for injunction or relief or damages which the Company may, in its sole discretion, decide to take in respect of such infringement or unauthorized use." *Id*.

35.     Northern Trust also agreed that it would return the Midas software within thirty days of the end of its license term. Under Section 11.1 of the 1997 License Agreement, Northern Trust agreed that "[w]ithin thirty (30) days of the termination of this Agreement, for any cause whatsoever, the Client shall return to the Company the System and any modified versions thereof, the Documentation and all other Material relating to the System received by the Client from the Company or any other source and all copies of any of them." **Exhibit 2** at 6.

36.     Over the years, Finastra developed, and Northern Trust licensed, new versions of the Midas software, including the Midas R4 software.

37.     In 2009, Northern Trust and Finastra (then known as Misys International Banking Systems, Inc.) agreed to apply Northern Trust's then-existing license terms to the Midas R4 software under the Schedule to Agreement Number ON16427, dated October 20, 2009 (attached as **Exhibit 4**).

38.     In 2011, Northern Trust and Finastra (then known as Misys International Banking Systems, Inc.) agreed to Agreement Number ON30939, dated May 16, 2011 (the "2011 Supplemental License Agreement") (attached as **Exhibit 5**).  The scope of the license was narrow:  it authorized Northern Trust to use only a single installation of the Midas R4 software per licensed purpose of use.

39.     Specifically, the Schedule to the 2011 Supplemental License Agreement specified that the perpetual license to the Midas R4 software extended to one production installation, one test installation, and one disaster recovery installation in the form of a cold backup only.  Under Section 2.1 of the 1997 License Agreement, as amended by the 1997 Variation Agreement, Northern Trust "shall only use the System or any modified form of the System upon the Environment and at the Location . . . ."  **Exhibit 3** at 5.  The 1997 License Agreement defined "Environment" as "[t]he Environment set out in the Schedule."  **Exhibit 2** at 1.  The Schedule to the 2011 Supplemental License Agreement then set the scope of the Environment, providing for only one installation in each of three specific "Environments":  production, testing, and cold backup (i.e., a backup of the production system that that can only be updated during production system downtime).  It did not permit any so-called hot backup (i.e., a backup running a "mirror image" of the production system, which can be updated while the production system is up and running).

40.     The Schedule stated that the Environment includes only: "Production and testing: Yes"; "Cold Backup: Yes"; and "Hot Backup: As provided in Clause 2.3 of the Original Agreement as amended by Variation Agreement VNYC970018 dated 22nd August 1997." **Exhibit 5** at 2.  Section 2.3 as amended by the 1997 Variation Agreement, in turn, required

Northern Trust to obtain written permission from Finastra to maintain a backup.  Finastra never granted Northern Trust permission to maintain a hot backup.

41.    The 2011 Supplemental License Agreement also limited installation to a single location—Chicago—but permitted affiliates/subsidiaries located outside of Chicago to access the Chicago-based Midas R4 software via remote terminal access.  Reflecting this arrangement, the Schedule to the 2011 Supplemental License Agreement listed the "Location of Installation" solely as "Chicago, Illinois," and the "Location(s) of Use" as "Worldwide."  **Exhibit 5** at 2.

42.    The parties agreed that Northern Trust had no ownership rights in the software. Among other things, Agreement Number ON75701, dated March 25, 2014 (the "2014 Supplemental License and Amendment Agreement," or the "2014 SLAA") (attached as **Exhibit 6**),  added to Section 2.1 of the 1997 License Agreement a reservation of rights clause, which provided that "[a]ll rights not expressly granted in this Agreement are reserved by Company and its licensors and Client acknowledges that the System is licensed and not sold."  **Exhibit 6** at 1.

***The conversion of Northern Trust's perpetual license to a term-limited license, as part of Northern Trust's stated intent to migrate off the Midas R4 software***

43.    By 2018, Finastra had initiated a strategic plan to move customers to newer versions of the Midas software.  As part of that plan, on June 30, 2018, more than two decades after the 1997 License Agreement, Finastra terminated maintenance and support for the Midas R4 software other than very limited technical support, which provides customers with operational support but no right to obtain corrections in the event of a defect in the software.

44.    Well in advance of that date, Finastra gave notice to Northern Trust that it would terminate all maintenance and support for the Midas R4 software other than very limited technical support and encouraged Northern Trust to upgrade to the most recent (and fully-

supported) version of the software.  Absent such an upgrade, Northern Trust would hold a perpetual license to software that was unsupported beyond very limited technical support. Continuing to use the Software to operate core banking systems without support would present significant operational and regulatory risks to Northern Trust, and call into question the safety and soundness of its operations, because it would be unable to obtain assistance from Finastra to remediate vulnerabilities or defects.

45.    In February 2018, Northern Trust notified Finastra that it would soon migrate off the Midas platform and therefore did not want to spend the time and money to upgrade to a fully supported version.  At the same time, Northern Trust was mindful of the safety and soundness implications of continuing to use the Midas R4 software without full support.  Northern Trust therefore proposed entering into a new, extended-support agreement that would allow it to receive continued support, including defect corrections, for the Midas R4 software for a limited time as it wound down its use of the software.

46.    In light of Northern Trust's representations that it merely needed time to migrate off of the Midas software, the parties ultimately entered into Agreement Number ON126505, dated February 27, 2019 (the "2019 License Agreement") (attached as **Exhibit 7**).  In the 2019 License Agreement, Northern Trust agreed to convert its perpetual license to the Midas R4 software into a three-year subscription license with extended support.  The 2019 License Agreement provided under "Amendments" that the previous perpetual license "shall be deemed null and void for the Subscription Term and superseded by a new license grant consistent with the restrictions set forth in the [1997] License Agreement, [the parties' general terms of trading agreement], [the 2011] Supplemental License Agreement and the [2014] SLAA."  **Exhibit 7** at 1. The Subscription Term would run from January 1, 2019 through December 31, 2021.

11

47.     Consistent with Northern Trust's stated expectation that it would migrate off the Midas platform by the conclusion of the term of the 2019 License Agreement, that agreement provided that upon its expiration, Northern Trust would revert to its effectively unsupported perpetual license.

48.     Specifically, the 2019 License Agreement provided under "Expiration of the Subscription Term" that "[u]pon expiration of the Subscription Term, the Subscription License shall convert back to a fully paid perpetual license (consistent with clause 3 of the [1997] License Agreement to use the Midas R4 software at the capacity of the then current Price Category (aka the Volume Based Pricing Category) and subject to the other restrictions, limitations, obligations and requirements set forth in the agreements referred to in the Reference Agreements section below [*i.e.*,, the 1997 License Agreement, the parties' general terms of trading agreement, the 2011 Supplemental Agreement, and the 2014 Supplemental License and Amendment Agreement]."  **Exhibit 7** at 1.

*The parties' entry into a new license agreement and extinguishment of the perpetual license*

49.     In the months leading up to the expiration of the 2019 License Agreement's term on December 31, 2021, Northern Trust indicated that—despite its insistence three years earlier that it was migrating off the Midas platform—it wished to continue using the Midas software. The parties discussed Northern Trust's renewal options.

50.     Northern Trust still did not want to upgrade to a newer version of the Midas software because it continued to insist that it would soon migrate off the software platform entirely.

51.     At the same time, because Northern Trust was not yet ready to transition off the Midas R4 software, it did not want to exercise its option under the 2019 License Agreement to

12

revert back to a perpetual license of an effectively unsupported version of the Software, with all that doing so would imply for the safety and soundness of Northern Trust's operations.  Instead, Northern Trust sought to obtain another subscription license that would continue to provide maintenance and support for the Software for a limited period.

52.     Finastra was willing to agree to such a subscription license, but only so long as Northern Trust agreed that at the conclusion of the term of this new agreement, any and all rights to use the Software—even on an effectively unsupported basis—would terminate.

53.     In January 2022, the parties accordingly entered into the January 2022 License Agreement.  The January 2022 License Agreement provided that it was no mere pricing addendum to any previous agreement, but rather was the sole agreement governing Northern Trust's right to use the Midas R4 software.  Whereas the 2019 License Agreement was identified as a "Specific Agreement" under the terms of the 1997 License Agreement, the January 2022 License Agreement was not.  Instead, it was denominated as a standalone "License Extension and Amendment Agreement."  **Exhibit 1** at 1.

54.     The January 2022 License Agreement also made clear that any and all rights of Northern Trust to use the Software would expire on December 31, 2023.

55.     To start, in the agreement's recitals—which the parties expressly stated "are intended to be a binding part of this Agreement"—the parties agreed that Northern Trust's "license to use the Midas R4 software is due to expire on December 31, 2021," and that the license extension contained in the January 2022 License Agreement was "to the exclusion of all other terms relating to [Northern Trust's] options at renewal of the Subscription Term as set forth in the Midas License Order [*i.e.*, the 2019 License Agreement]."  **Exhibit 1** at 1.

56.     The agreement then provided that Northern Trust's right to use the Midas R4 software would expire on December 31, 2023: "In consideration of the payment of the annual Subscription Fees set out in Section 3 below for the full duration of the Extended Subscription Term, [Finastra] agrees to extend [Northern Trust's] right to use the Midas R4 software for an additional term of two (2) years commencing on January 1, 2022 and ending on December 31, 2023 (the 'Extended Subscription Term')." **Exhibit 1** at 1.

57.     The renewal options available to Northern Trust at the end of the Extended Subscription Term likewise reflected the expiration of any and all rights of Northern Trust to use the Midas R4 software at that term's conclusion. Section 4.1 provided that Northern Trust could, under certain conditions that Northern Trust ultimately did not meet, elect "to extend [its] right to use the Midas R4 software" for an additional year by paying an additional fee. **Exhibit 1** at 1. This language reinforced the clear understanding that, absent such a renewal and extension, Northern Trust had no right to use the software at the conclusion of the Extended Subscription Term.

58.     The January 2022 License Agreement additionally provided under Section 4.2.2.1 that solely in the event that (i) Northern Trust qualified for and exercised the one-year extension, and (ii) Finastra then offered Northern Trust only Technical Support, Northern Trust could "revert its license to the Midas R4 software back to a perpetual license"—thereby manifesting the parties' mutual understanding that in no other circumstance was any perpetual license in effect following the expiration of the Extended Subscription Term. **Exhibit 1** at 2.

59.     Northern Trust did not ultimately exercise the one-year extension granted under Section 4.1. By declining to do so, Northern Trust extinguished the sole option available under the January 2022 License Agreement to revert back to a perpetual license. And by declining to

14

do so, Northern Trust sealed the December 31, 2023 expiration date of its right to use the Midas R4 software.

***Northern Trust's repeated acknowledgements over the course of 2023 that its right to use the Midas R4 software will expire on December 31, 2023***

60.     Throughout 2023, as the end of Extended Subscription Term approached, various Northern Trust representatives repeatedly confirmed Northern Trust's understanding that its right to use the Midas R4 software would expire on December 31, 2023.

61.     For example, on May 18, 2023, Finastra reminded Rene Beauchesne (Senior Vice President, Senior Director, Head of FX Back Office Technology at Northern Trust) of the expiration scenarios:

a.     "[Northern Trust's] license to Midas expires 31 Dec 2023. At that time, all rights to use the software cease and [Northern Trust] must immediately stop using the software.  As such, Finastra will not issue an invoice for CY 24."

b.     "However, if [Northern Trust] wants to renew its license for another year, it must provide us with a notice of its intension to do so before 31 Oct 2023.  If it does not, then the license will expire."

c.     "If [Northern Trust] does not give the renewal notice and finds that as of 31 Dec 2023 it cannot cease using the software, then [Northern Trust] will need to sign a new license with Finastra but the 1 year term and pricing options in the contract will not apply."

62.     In response that same day, Mr. Beauchesne acknowledged that, absent renewal, Northern Trust would have no license to use the software, writing:  "Yes, we want to extend our license for 2024."

15

63. Northern Trust repeated this understanding in October 2023. On October 4, Finastra responded to a request from Mr. Beauchesne for alternative proposals to address the impending expiration, one for a potential renewal of the license and another to purchase the Midas R4 source code and transition services away from the Midas R4 software: "I will work with our teams on the two proposals that you had requested as follow: 1. Renewal Extension[;] 2. Midas Source Code + Transition Services (if applicable)[.]"

64. In response that same day, Mr. Beauchesne confirmed that the Northern Trust C-suite preferred a license renewal: "I just talked to my CIO/ CTO and they want to focus our conversaion [sic] ton [sic] the Renewal Extension only."

65. Other Northern Trust representatives had the same understanding regarding the impending expiration of Northern Trust's right to use the Midas R4 software.

66. On November 29, 2023, Finastra sent an email to Elizabeth Sigal (Senior Vice President, Global Technology & Facilities Procurement at Northern Trust). Finastra included a screenshot of Section 2.0 of the January 2022 License Agreement, which stated that Northern Trust's "right to use the Midas R4 software" would end "on December 31, 2023." In the email, the Finastra representative who sent the email to Ms. Sigal observed that "[t]his appears to indicate that the license to the software itself is due to expire on Dec 31, 2023." Ms. Sigal responded that same day and agreed, writing that "[t]he licens[ing] and support expires on Dec 31, 2023."

67. There was nothing surprising about these acknowledgements, given what the January 2022 License Agreement states on its face: that Northern Trust's "right to use the Midas R4 software" would be "ending on December 31, 2023."

***Finastra's audits of Northern Trust's usage and discovery that Northern Trust was exceeding the scope of its license***

68.     In light of Northern Trust's request for a new license—and Finastra's corresponding need to understand the scope of the license that Northern Trust needed—Finastra requested information and data about Northern Trust's system architecture in early October 2023.

69.     Finastra obtained a general audit right under Section 2.2 of the 1997 License Agreement, as amended by the 1997 Variation Agreement, which provided in relevant part that it "shall have the right, at any time and from time to time, to audit the Client's use of the System in order to assure compliance with the terms of this Agreement and upon request by the Company, the Client shall give full cooperation to the Company in carrying out such audit."  **Exhibit 3** at 5.

70.     As described above, the pricing for Finastra's Midas R4 software licenses depends on two distinct measures of software usage:  (1) the number of software installations on the underlying system architecture, and (2) the volume of transactions processed, under a volume-based pricing, or "VBP," matrix.

71.     A previous audit of Northern Trust's usage by volume had revealed that Northern Trust's usage exceeded the scope of its license.  As of early 2019, Northern Trust had licensed a volume corresponding to VBP level 11 under the latest agreement setting volume, Agreement Number ON89889, dated May 23, 2014 (attached as **Exhibit 8**).  In April 2019, Finastra commenced an audit of Northern Trust's volume usage of the Midas R4 software.

72.     As reflected in an audit analysis dated May 24, 2021, the audit ultimately revealed that, despite Northern Trust's ongoing representations that it was winding down its reliance on

the Midas software, Northern Trust's volume usage corresponded to VBP level 12—i.e., that Northern Trust's use *exceeded* the scope of the license for which it had paid.

73.     Northern Trust then purchased an increased VBP level to address its unlicensed use. Yet Northern Trust did not merely purchase an increase to VBP level 12 to meet its unlicensed use. Instead, in Agreement Number ON202843, dated June 13, 2021 (the "2021 VBP Additional Volume Agreement") (attached as **Exhibit 9**), Northern Trust purchased two additional volume levels up to VBP level 14, in contemplation of anticipated increased future use of the Midas R4 software.

74.     In consideration for Northern Trust's purchase of additional volume, Finastra agreed "to suspend its right to conduct an audit of the Client's Price Category (aka the level of Client's Volume Based Pricing) until 1 January 2024." **Exhibit 8** at 1. This suspension was limited by its plain terms to Finastra's right to conduct a *volume* audit and did not affect Finastra's right to conduct a compliance audit of Northern Trust's system architecture—i.e., the number of installations that Northern Trust was operating.

75.     Based on that volume audit suspension, Northern Trust initially resisted Finastra's October 2023 request for information and data about Northern Trust's system architecture, claiming on October 10, 2023 that the suspension of the *volume* audit right set forth in the 2021 VBP Additional Volume Agreement prevented any *compliance* audit or other request for information and data. After Finastra pointed out that the volume audit suspension clause was limited on its face only to audits of the level of volume-based pricing, Northern Trust relented in part and provided partial and sporadic responses to Finastra's information and compliance audit requests.

18

76.    To date, Northern Trust has still refused to permit a complete audit and has refused to provide to Finastra the results of scripts that would demonstrate the full scope of Northern Trust's use of the Software.

77.    As described above, Northern Trust's license encompassed only one production installation, one test installation, and one cold backup installation.  A system architecture audit analysis transmitted on or around December 6, 2023, however, revealed that Northern Trust had been using eight production installations, eight test installations, and sixteen disaster recover installations in the form of cold backup.  The audit analysis also revealed that Northern Trust had been using eight disaster recovery installations in the form of hot backups without the requisite consent for any hot backup installations.  In total, Northern Trust's historical usage of the Midas R4 software exceeded the scope of its license by thirty-seven installations of the software.

78.    Upon information and belief and based on its reported usage, Northern Trust also duplicated the proprietary Midas R4 software database tables from its Chicago-based installations of the Software without any license to do so, and transmitted the database tables to Singapore, China, and other countries abroad to use for data storage purposes.

79.    On or around December 21, 2023, Finastra provided a price quote to Northern Trust for a Midas R4 license renewal, reflecting standard terms under Finastra's worldwide pricing model based on Northern Trust's actual usage of the Midas R4 software, as revealed by Northern Trust's partial responses to Finastra's October 2023 request for information and data about Northern Trust's system architecture.

80.    Northern Trust, for its part, refused to pay for its historical usage beyond the scope of the license and also refused to agree to pay for a new license that reflected the scope of its actual use.

81.     Instead, on December 31, 2023—the very last day of the term of the January 2022 License Agreement—outside counsel for Northern Trust asserted for the first time the position that, upon expiration of the January 2022 License Agreement, the perpetual license under the 1997 Agreement would spring into place.

82.     This position—concocted by Northern Trust's outside counsel at the eleventh hour, in the face of Northern Trust's failure to either move off of the Midas platform or successfully procure a new license to use the software—is contrary to the explicit terms of the January 2022 License Agreement, in which Northern Trust expressly recited that its right to use the Midas R4 software would expire on December 31, 2023.  And it is contrary to the repeated acknowledgements by Northern Trust over the course of 2023 that it would have no right to use the software beyond that date unless Northern Trust and Finastra agreed on the terms of a new license.

***Northern Trust's decision to knowingly and intentionally continue to use the Midas R4 software following the expiration of its license***

83.     Beginning January 1, 2024, Northern Trust has continued to use the Midas R4 software without any license to do so, thereby infringing Finastra's copyrights in the Software.

84.     Finastra has repeatedly demanded that Northern Trust cease using the Software, most recently by letter dated February 13, 2024.

85.     Notwithstanding those demands, Northern Trust has continued to use Finastra's Midas R4 software.

86.     Northern Trust's unlicensed and unsupported use of the Software for core banking operations not only violates Finastra's rights, but also jeopardizes the safety and soundness of the bank and its customers' deposits.

20

87.     As described below, Finastra is suffering irreparable harm from Northern Trust's ongoing infringement and its pending destruction of the evidence that will make it impossible to calculate the damages that Northern Trust owes Finastra.

88.     When a customer licenses the Midas R4 software, the software is installed on the customer's machines.  As was commonplace in software of its era, Midas R4 utilizes only hard-copy installations and does not utilize software license keys.

89.     Because Midas R4 does not utilize software license keys, Finastra cannot turn off or otherwise remotely uninstall a copy of the Software once it is installed on a customer's machines.  This limitation prevents Finastra from turning off or remotely uninstalling its Midas R4 software from Northern Trust's machines.

90.     Nor can Finastra assess the scope of Northern Trust's ongoing usage in terms of either volume of transactions processed or number of installations maintained without performing an audit, which requires Northern Trust's cooperation with respect to both identifying all installations of the Software and running, at each installation, the scripts that would report the scope of usage at each installation.  These limitations prevent Finastra from assessing either the current scope of Northern Trust's usage of its proprietary Midas R4 software or the historical scope of such usage.

91.     Northern Trust has represented to Finastra that it is actively working to transition off the Midas R4 software and intends to substantially complete that transition at some point in the first half of 2024.  While Finastra agrees that Northern Trust's unlicensed use of the Software must cease, Northern Trust's plan to decommission its Software installations means that there will be no record of either (i) the number of Software installations, or (ii) the volume used at

each installation—the two criteria that are essential to calculating Finastra's damages from Northern Trust's historical and ongoing infringement.

92.     On January 5 and again, on February 13, 2024, Finastra asked Northern Trust to run volume audit scripts for all of its production systems and provide Finastra with the results. However, these audit scripts can only reveal the volume of transactions on any extant software production installations.  They cannot assess volume on software production installations that Northern Trust decommissioned after the expiration of its subscription term.

93.     Even this volume audit, however, demonstrated that Northern Trust's volume usage in 2023 exceeded the scope of its license *again*.  The audit script reports revealed that Northern Trust's 2023 volume usage corresponded to VBP level 17, even though Northern Trust had only purchased volume corresponding to VBP level 14 in the 2021 VBP Additional Volume Agreement.  These results also made clear that Northern Trust had secured the prior suspension of Finastra's volume audit right in bad faith, in order to prevent Finastra from learning that Northern Trust would *increase* its use beyond the VBP level 14 for which it paid, despite claiming that it planned to *reduce* its use of the Midas software.

94.     In its letter dated February 13, 2024, Finastra also demanded that Northern Trust confirm that it would provide reports indicating all of its extant software production installations on all machines and logical partitions therein, and the names, numbers, and dates of decommission of any previous installations, whether production or non-production.  Northern Trust has refused to provide such confirmation.  Beyond that, Northern Trust has refused to acknowledge additional installations that it maintains and/or has maintained on additional machines of which Finastra is aware.

95.    In light of the results of the audit of Northern Trust's volume on *production* systems, on March 4, 2024, Finastra demanded that Northern Trust provide a usage report for *all* machines and for each logical partition therein on which Northern Trust maintains or has ever maintained a Midas software installation, including test and backup systems.  Finastra also demanded that Northern Trust confirm that it maintains no additional installations of the Midas software, including its database tables, outside of Chicago, Illinois or on any other undisclosed machines or logical partitions, and that NT possesses no copies of the Midas source code. Northern Trust has refused to provide such reports and confirmation.

96.    In sum, Finastra has no way to block Northern Trust from continuing to infringe its copyrights in the Midas R4 software, no way to prevent Northern Trust from erasing the record of its infringing use to zero, and no way to then calculate the damages that Northern Trust owes for its wholesale and intentional infringement of Finastra's rights.

## CLAIMS FOR RELIEF

### COUNT I
### COPYRIGHT INFRINGEMENT (FOLLOWING DECEMBER 31, 2023)

97.    Finastra incorporates by reference the allegations set forth in all prior paragraphs of this Complaint as if set forth fully herein.

98.    Finastra is the sole owner of the U.S. copyrights in the Midas R4 software and the underlying Midas software platform.

99.    Northern Trust's right to use Finastra's copyrighted Midas R4 software expired on December 31, 2023.  Northern Trust's continued use of the Midas R4 software constitutes copyright infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq.*

100.    Northern Trust's infringement has been willful, intentional, and purposeful, in blatant disregard of Finastra's rights.  Northern Trust has continued its infringement after receiving multiple infringement notices and cease-and-desist demands.

101.    As a direct and proximate result of Northern Trust's willful infringement of Finastra's copyright, at Finastra's election, Finastra is entitled to its actual damages pursuant to 17 U.S.C. § 504(b), including Northern Trust's profits from the infringements, in an amount to be proven at trial.  Alternatively, Finastra is entitled to damages pursuant to 17 U.S.C. § 504(c) in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).

102.    Northern Trust's ongoing usage of the Midas R4 software is causing and, unless enjoined by this Court, will continue to cause Finastra irreparable injury for which a measure of full monetary compensation will be impossible to calculate.  Accordingly, Finastra has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Finastra is entitled to preliminary and permanent injunctive relief prohibiting Northern Trust together with its directors, officers, agents, servants, employees, attorneys, parents, subsidiaries, divisions, affiliates, other related business entities, and all persons in active concert or privity with them, and their successors and assigns, from using the Midas R4 software; and requiring Northern Trust to take all necessary steps to preserve the evidence of Northern Trust's use of the Software.

## COUNT II
## COPYRIGHT INFRINGEMENT (THROUGH DECEMBER 31, 2023)

103.    Finastra incorporates by reference the allegations set forth in all prior paragraphs of this Complaint as if set forth fully herein.

24

104.    Northern Trust's Midas R4 software licenses in effect up to December 31, 2023 permitted only a one Chicago-based installation of the Midas R4 software per purpose of use that could be used worldwide via remote access.  As set forth in paragraphs 30 through 41 of this Complaint, the scope of the license grant extended to one production installation, one test installation, and one cold backup installation.  Yet Northern Trust's historical usage of the Midas R4 software spanned forty total installations:  eight production installations, eight test installations, sixteen disaster recover installations in the form of cold backup, and eight disaster recovery installations in the form of hot backups.  Accordingly, despite holding a license to use only three installations of the Midas R4 software, and without any authorization, permission, license, or consent to do so, Northern Trust instead maintained and used installations of the Software in excess of the scope of its license by thirty-seven total installations.

105.    Upon information and belief and based on its reported usage, Northern Trust also duplicated the proprietary Midas R4 software database tables from its Chicago-based installations of the Software and transmitted the database tables to Singapore, China, and other countries abroad to use for data storage purposes in complying with the data residency requirements of those jurisdictions.

106.    As a direct and proximate result of Northern Trust's willful infringement of Finastra's copyright, at Finastra's election, Finastra is entitled to its actual damages pursuant to 17 U.S.C. § 504(b), including Northern Trust's profits from the infringements, in an amount to be proven at trial.

## COUNT III
### BREACH OF CONTRACT (IN THE ALTERNATIVE)

107.    Finastra incorporates by reference the allegations set forth in all prior paragraphs of this Complaint as if set forth fully herein.

108.    Northern Trust used the Midas R4 software far beyond the terms provided for in its licenses, including the 1997 License Agreement, the 1997 Variation Agreement, the 2011 Supplemental License Agreement, the 2014 Supplemental License and Amendment Agreement, the 2019 License Agreement, the 2021 VBP Additional Volume Agreement, and the January 2022 License Agreement.

109.    Northern Trust's use of the Midas R4 software in violation of the terms of these license agreements constitutes a material breach of contract.

110.    Northern Trust's material breach of its contracts with Finastra have proximately caused Finastra harm, for which Finastra is entitled to damages in an amount to be determined at trial.

## COUNT IV
### TRADE SECRET MISAPPROPRIATION (18 U.S.C. § 1836)

111.    Finastra incorporates by reference the allegations set forth in all prior paragraphs of this Complaint as if set forth fully herein.

112.    Finastra's Midas R4 software is a proprietary product used in interstate and foreign commerce and consists of trade secrets in the form of its source code, scripts, and the structure and definition of its database tables; proprietary real-time and batch processing methods to perform the Software's various operations; the screens and reports that the Software creates; and the guides, manuals, and training documentation associated with the Software (the "Midas

26

R4 Trade Secrets"). These trade secrets underpin the unique functionality of the Midas R4 software in providing a core banking system.

113. At all times, Finastra has taken appropriate measures to protect the Midas R4 Trade Secrets from unauthorized disclosure or use, including, but not limited to the inclusion of specific provisions in the 1997 Agreement, as set forth in paragraphs 103 through 112, that required Northern Trust to directly control, manage, and resource the operation of the Midas R4 software and the computer upon which it runs without contracting to a third party; not to disassemble the Midas R4 software; and to alert Finastra of any copyright infringement or trade secret misappropriation.

114. By continuing to possess and use the Midas R4 software, Northern Trust possesses and uses the Midas R4 Trade Secrets. Northern Trust possession and use of the Midas R4 Trade Secrets is willful and malicious because, as described herein, Northern Trust has continued to possess and use the Software despite its understanding that its right to use the Software expired on December 31, 2023 and despite its receipt of multiple infringement notices and cease-and-desist demands.

115. Northern Trust is using the Midas R4 Trade Secrets in breach of the parties' agreement under Section 11.1 of the 1997 License Agreement that Northern Trust would return the Midas R4 software within thirty days of the December 31, 2023 expiration of its right to use the Software.

116. Northern Trust's willful and malicious misappropriation of the Midas R4 Trade Secrets constitutes a violation of 18 U.S.C. § 1836.

## COUNT VII
## TRADE SECRET MISAPPROPRIATION (NEW YORK LAW)

117.    Finastra incorporates by reference the allegations set forth in all prior paragraphs of this Complaint as if set forth fully herein.

118.    Finastra's Midas R4 software is a proprietary product used in interstate and foreign commerce and consists of the Midas R4 Trade Secrets.  These trade secrets underpin the unique functionality of the Midas R4 software in providing a core banking system.

119.    At all times, Finastra has taken appropriate measures to protect the Midas R4 Trade Secrets from unauthorized disclosure or use, including, but not limited to the inclusion of specific provisions in the 1997 Agreement, as described above, that required Northern Trust to directly control, manage, and resource the operation of the Midas R4 software and the computer upon which it runs without contracting to a third party; not to disassemble the Midas R4 software; and to alert Finastra of any copyright infringement or trade secret misappropriation.

120.    By continuing to possess and use the Midas R4 software, Northern Trust possesses and uses the Midas R4 Trade Secrets.  Northern Trust possession and use of the Midas R4 Trade Secrets is willful and malicious because, as set forth above, Northern Trust has continued to possess and use the Software despite its understanding that its right to use the Software expired on December 31, 2023 and despite its receipt of multiple infringement notices and cease-and-desist demands.

121.    Northern Trust is using the Midas R4 Trade Secrets in breach of the parties' agreement under Section 11.1 of the 1997 License Agreement that Northern Trust would return the Midas R4 software within thirty days of the December 31, 2023 expiration of its right to use the Software.

28

122.   Northern Trust's willful and malicious misappropriation of the Midas R4 Trade Secrets constitutes a violation of New York law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment from this Court against Northern Trust as follows:

a.   Preliminary and permanent injunctive relief enjoining Northern Trust together with its directors, officers, agents, servants, employees, attorneys, parents, subsidiaries, divisions, affiliates, other related business entities, and all persons in active concert or privity with them, and their successors and assigns, from directly or indirectly infringing Finastra's copyrights, from misappropriating Finastra's trade secrets, and/or from destroying evidence of such infringement or misappropriation; and requiring Northern Trust to run the commands and take all other steps necessary to preserve the evidence of Northern Trust's use of the Software;

b.   An award, at Finastra's election, of Finastra's actual damages pursuant to 17 U.S.C. § 504(b), including Northern Trust's profits from infringement, in an amount to be proven at trial, but not less than $100,000,000; or, in the alternative, statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Northern Trust's willful violations of Finastra's rights under the Copyright Act;

c.   An award of damages in an amount to be proven at trial, but not less than $100,000,000, arising from Northern Trust's breach of contract;

d. An award of damages for Finastra's actual loss and Northern Trust's unjust enrichment caused by Northern Trust's unauthorized use of Finastra's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B)(i); or, in the alternative, damages measured by imposition of liability for a reasonable royalty for Northern Trust's unauthorized use of Finastra's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B)(ii);

e. An award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), in an amount up to the maximum provided by law, for Northern Trust's willful and malicious misappropriation of Finastra's trade secrets;

f. An award of damages arising from Northern Trust's willful and malicious violation of Finastra's rights under New York trade secret law;

g. A disgorgement of Northern Trust's profits that are attributable to its historical and ongoing copyright infringement;

h. An award of Finastra's costs in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

i. An award of pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Northern Trust; and

j. Such other and further relief as this Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Finastra hereby demands a trial by jury

of all issues that are so triable.

DATED:        March 20, 2024            By: 

Jonathan M. Sperling
Jordan S. Joachim
Ryan A. Partelow
Harrison A. Newman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000
jsperling@cov.com
jjoachim@cov.com
rpartelow@cov.com
hnewman@cov.com

*Counsel for Plaintiff*
*Finastra Technology, Inc.*

31