# Exhibit 2



**Midas-Kapiti**
INTERNATIONAL

AGREEMENT Number LNYC970018 made on the __2 2__ day of August 1997

by and between Midas-Kapiti International Inc. ("the Company") a Delaware corporation,

having its principal place of business at 45 Broadway, New York, NY 10006

and

The Northern Trust Company ("the Client") a corporation, having its principal place of

business at 50 South LaSalle Street, Chicago, Illinois 60675

_____.

RECITAL:

The Company has agreed with the Client to grant the Client a non-exclusive, non-transferable license to use the System as herein after defined subject to the terms and restrictions set out in this Agreement and subject to the Company's General Terms of Trading.

TERMS:

1    DEFINITIONS

1.1    The General Terms of Trading ("General Terms") executed by the Company and the Client are in effect as set out therein and this Agreement shall constitute a Specific Agreement for the purposes thereof and references therein to Products shall be interpreted in this Agreement to include the System.

1.2    In this Agreement and its recital and Schedule hereto the following words shall (unless the context otherwise requires) bear the following meanings:

**System:** The computer object programs, procedure statements, screen layouts and definitions and Documentation for the software products listed in the Schedule.

**Documentation:** The manuals which describe the functions and operation of the System and which are listed in the Schedule.

**Environment:** The environment set out in the Schedule.

**Location:** The location(s) set out in the Schedule.



**Midas-Kapiti**
I N T E R N A T I O N A L

**Price Category:** The price category which, if applicable to this Agreement, is defined in the Schedule and which determines the level of license fee for the System set out therein relative to a defined volume of transactions to be processed by the System.

**Schedule:** The Schedule hereto.

**Maintenance Release:** A release of the System or part thereof which enables the System to perform according to the Documentation or to operate upon the Environment.

2    GRANT OF RIGHTS

2.1    The Company hereby grants to the Client the right to use the System upon the Environment at the Location which right shall be non-exclusive and the Client shall not directly or indirectly sell, lease, license, assign, transfer or otherwise encumber the System or any modified form of the System or any part thereof. The Client shall only use the System or any modified form of the System upon the Environment and at the Location and for the processing of its own data for its own internal business purposes and shall not use the System or any part thereof directly or indirectly as a data processing service bureau for any third party.

2.2    The Company shall have the right, at any time and from time to time, to audit the Client's use of the System in order to assure compliance with the terms of this Agreement and upon request by the Company, the Client shall give full cooperation to the Company in carrying out such audit.

3    TERM

This Agreement shall commence on the date of this Agreement and shall continue for ten (10) years unless terminated earlier in accordance with the terms hereof or the General Terms.

4    SYSTEM OPERATION

4.1    The Client shall provide the Environment. Operation of the System and the computer installation upon which it runs shall be directly controlled, managed and resourced by the Client and not contracted to a third party.

MKILA/1296



4.2  **WARNING!**

The Company warrants and represents that the System does not contain any disabling device which, upon the Client's failure to pay any license fees, annual fees or other charges due to the Company, shall automatically deactivate the functionality of the System or otherwise preclude the productive use of the System as authorized herein.

Notwithstanding the foregoing, the System does incorporate features which shall prevent access to the System by any user/workstation which is in excess of the number of users/workstations authorized pursuant to this Agreement.

5  MODIFICATION BY THE CLIENT

5.1  The Client may modify the System or develop additional functionality using the facilities of the System subsequent to its acceptance hereunder for use by the Client upon the Environment at the Location but such modifications or additional functionality shall not be directly or indirectly sold, leased, licensed, assigned, transferred to any firm, person, or corporation or other body or otherwise encumbered by the Client and the Company's right to make any modifications or develop additional functionality to the System for its own purposes or for other licensees, whether or not similar to any such made or developed by the Client, shall not be affected or prejudiced in any way.

5.2  Subject to sub-clause 5.1 all rights in any modifications or additional functionality developed by the Client shall, as between the Company and the Client, vest in the Company absolutely.

6  PAYMENTS

6.1  The Recurring Fees specified in the Schedule are fixed for twelve months from the date of this Agreement.  Thereafter, the Company shall have the right to substitute for them its then standard fees, and the Client hereby agrees to pay same.

6.2  In the Company's sole discretion, use of the System on an upgraded or modified Environment may result in an additional fee becoming payable by the Client to the Company and the Client hereby agrees to pay same.

6.3  If the volume of transactions processed by the Client on the System increases beyond that set out in the Price Category, the Company will charge an additional fee in accordance with its then standard fees, and the Client hereby agrees to pay same.

 **Midas-Kapiti**
INTERNATIONAL

6.4 Where any unauthorized use of any part of the System occurs, and that use is attributable to the act or omission of the Client, then, without prejudice to the Company's other rights and remedies, the Client shall pay to the Company an amount equal to the fees which would have been payable under the Company's then standard fees had such use been properly licensed to the Client.

6.5 All costs and expenses associated with the delivery of the System will be paid by the Client.

7 WARRANTY

THE COMPANY WARRANTS THAT THE SYSTEM PERFORMS IN ALL MATERIAL RESPECTS IN ACCORDANCE WITH THE DOCUMENTATION BUT NO WARRANTY IS GIVEN OR IMPLIED AS TO THE SUITABILITY OF THE SYSTEM FOR ANY PARTICULAR PURPOSE OR FOR THE CLIENT'S PARTICULAR BUSINESS.

8 DELIVERY AND ACCEPTANCE

The Company shall procure the delivery of the System to the Client. Upon delivery the Client shall perform an acceptance test upon the System and such acceptance test shall be deemed to have been successfully completed and the System shall be deemed to have been accepted upon expiration of thirty (30) days after the delivery of the System unless the Client during such 30 day period has notified the Company, in writing, of failures to meet and perform tasks specified in the Documentation together with full details of the nature of said failures. In such event, the acceptance test shall be deemed successfully completed when the Company has overcome the failures so notified by the Client. In any event, the System shall be deemed to have been accepted when the Client has processed any data with the System or any part thereof other than data specifically submitted for the purpose of acceptance testing or has used or relied upon the output of the System for the conduct of its business, whichever first occurs.

9 MAINTENANCE AND SERVICES

9.1 The Company will (provided no sums are outstanding and due to the Company) provide to the Client a maintenance service as defined in sub-clauses 9.2, 9.3 and 9.4 throughout the period of this Agreement commencing from the date of acceptance as defined in clause 8.

MKILA/1296



**Midas-Kapiti**
I N T E R N A T I O N A L

9.2    The Company will, free of charge, correct or procure the correction of any failures of the System to perform tasks specified in the Documentation which are fully identified in writing by the Client to the Company in accordance with the Company's standard procedures as notified to the Client from time to time, provided that no modifications which affect the resolution of the failures have been made to the System other than by the Company and provided the Client is using either the most recent Maintenance Release or the one immediately before that and provided further that the System is being used upon the Environment.

9.3    The Company may produce Maintenance Releases from time to time and such new Maintenance Releases will be supplied to the Client at no additional fee. The parties hereto shall agree a delivery date for a new Maintenance Release, which date shall be no later than six months from notification to the Client of its availability. The Client shall test and install the Maintenance Release within 30 days of its delivery to the Client.

9.4    The Company will keep the Client informed of any modifications, new releases or enhancements to the System. Such modifications, new releases or enhancements shall be made available to the Client on the Company's then standard terms.

9.5    The above notwithstanding, the Client shall reimburse the Company for expenses, charges and costs incurred in the investigation and/or correction of errors in the System that are not the responsibility of the Company under sub-clause 9.2. In the event that an apparent error is not caused by a program malfunction or is caused by abuse or misuse of the System, the Company will record the time spent in investigating the error and will be entitled to charge the Client at its then standard fee rates, and the Client hereby agrees to pay same.

10    COPYRIGHT

10.1    The Client shall not decompile or disassemble the System or reverse compile, reverse assemble or reverse engineer the System from object code into source code (or attempt, authorize or permit the same) in any manner or for any purpose whatsoever without the Company's prior written consent which shall not be withheld where to do so would constitute a breach of any applicable legislation or regulations having the force of law.

10.2    The Client shall inform the Company promptly of any unauthorized use of the System or any infringement of the copyright or know-how and/or other proprietary rights relating to the System which shall come to its knowledge and shall, at the Company's expense, provide the Company with all reasonable assistance in any suit for injunction or relief or damages which the Company may, in its sole discretion, decide to take in respect of such infringement or unauthorized use.

MKILA/1296



**Midas-Kapiti**
I N T E R N A T I O N A I

10.3  The Company will, at its own cost, defend any action brought against the Client based upon a claim that the System infringes a patent or copyright of a third party and will pay the amount of any settlement or the costs and damages awarded after final judgment including reasonable legal fees (if any) in such action provided:

a)  that the Company is notified promptly, in writing, of any notice of claim or threatened or actual action and details thereof; and

b)  that at the Company's request and expense, the Company is given full cooperation by the Client for the defense by the Company, in its own or in the Client's name, of the claim or action.

Following notice of a claim or a threatened or actual action the Client agrees that the Company may, in satisfaction of its obligations to the Client, (i) procure for the Client the right to continue to use the System, or (ii) replace or modify the System so as to make it non-infringing of any third party rights, and the Company shall ensure that such replacement or modification shall perform in a manner similar in all material respects to the System as it was prior to such replacement or modification.

11   TERMINATION

11.1  Within thirty (30) days of the termination of this Agreement, for any cause whatsoever, the Client shall return to the Company the System and any modified versions thereof, the Documentation and all other Material relating to the System received by the Client from the Company or any other source and all copies of any of them.

11.2  Following acceptance as defined in clause 8 and provided no sums are outstanding and due to the Company, the Client shall be entitled to terminate this Agreement upon an anniversary of the date of this Agreement by giving not less than six months notice in writing to the Company.

12   CLAUSES SURVIVING TERMINATION

Notwithstanding the termination of this Agreement for any reason, those terms of this Agreement intended to have effect after termination and in particular (but without limitation) clause 2 (in so far as it relates to the restriction on the Client directly or indirectly to sell, lease, license, assign, transfer or otherwise encumber the System or any modified form of the System or part thereof)and clauses 5 and 10 shall continue in full force and effect.

MKILA/1296

**Midas-Kapiti**
I N T E R N A T I O N A L

## SCHEDULE

**LOCATION:** Regional Hub site in Chicago, Illinois with a remote site in London processing live transactions and remote sites in the United States (including Chicago), Toronto and Hong Kong processing test transactions.

### SYSTEM & ENVIRONMENT

| SYSTEM | ENVIRONMENT | |
|---|---|---|
| Software Products | Hardware/Operating System | Number of Processors, Users, Workstations |
| Midas DBA 2 | IBM AS/400  OS/400 | Not Applicable. |

| Module | United States | United Kingdom | Canada | Hong Kong |
|---|---|---|---|---|
| Core Platform | x | x | x | x |
| Midas/Q | x | x | x | |
| FX/MM Dealing | x | x | x | |
| FX Netting | x | x | | |
| Management Accounts | x | x | x | x |
| Direct Deal Interface | x | x | | |
| Internal Dealing | x | x | | |
| FRA/IRS (includes IRC) | x | x | | |
| Futures & Options | x | x | | |
| Enhanced Treasury | x | x | | |
| Customer Lending | | x | | |
| Treasury Management | x | x | | |
| Retail III | x | x | x | |
| SWIFT Direct Link | x | x | x | |
| User Defined Correspondences | x | x | x | |
| Exposure Management | x | x | x | |
| Asset & Liability Management | x | x | | |
| SWEEP Processing | x | x | x | |
| Rates Maintenance | x | x | x | |

The above modules may be used as indicated above for processing the data of the Client's operation at the above sites on the Environment at the Location.

MKILA/1296

 **Midas-Kapiti** INTERNATIONAL

## DOCUMENTATION

The Functional Specfications and all user documentation of the System as at the date of this Agreement and as they relate to any Maintenance Releases (per Clause 9) accepted by the Client.

## FEES

Price Category: Volume Based Pricing 4 in United States, 3 London, 1 Toronto, 1 Hong Kong (derived from the matrix attached at Appendix 1)

**(a)  Initial License Fees**

| Due Date (Event) | Currency/Amount |
|---|---|
| The earlier of contract signing date or August 22, 1997 | USD 634,000 |
| The earlier of delivery date or August 29, 1997 | USD 634,000 |
|  | USD 1,268,000 |

**(b)    Recurring License Fee**

The Recurring License Fee, shown below, is due upon the second day of each calendar year following Acceptance (as defined in clause 8). A pro-rated amount is due upon Acceptance for the period from Acceptance to the end of that calendar year.

| Software Product | Currency/Amount |
|---|---|
| Midas DBA 2 as defined under System | USD 194,000 |

IN WITNESS WHEREOF, the parties have, by their duly authorized representatives, executed this Agreement as at the date first before written.

SIGNED on behalf of the COMPANY and thereby duly authorized:

SIGNATURE *Richard Rosenthal*

FULL NAME  Richard Rosenthal

POSITION    Executive Vice President and Branch Manager

SIGNED on behalf of the CLIENT and thereby duly authorized:

SIGNATURE *Peter A Mag*

FULL NAME *PETER A. MAGRINI*

POSITION  *Senior Vice President*

MKILA/1296



APPENDIX 1
VOLUME BASED PRICING

Client:  The Northern Trust Company

License Agreement Number: LNYC970018          Dated:  August 22ND, 1997

| Business Area | Volume | Score | Volume | Score | Volume | Score | Volume | Score | Volume | Score |
|---|---|---|---|---|---|---|---|---|---|---|
| FX trans/day | <50 | 2 | 50-199 | 4 | 200-499 | 8 | 500-999 | 16 | 1000+ | 24 |
| outstandings | <150 | 1 | 150-499 | 2 | 500-1,499 | 4 | 1,500-2,999 | 8 | 3,000+ | 12 |
| | | | | | | | | | | |
| MM trans/day | <10 | 2 | 10-29 | 4 | 30-99 | 8 | 100-199 | 16 | 200+ | 24 |
| outstandings | <300 | 1 | 300-1,199 | 2 | 1,200-2,499 | 4 | 2,500-4,999 | 8 | 5,000+ | 12 |
| | | | | | | | | | | |
| Loan trans/month | <25 | 2 | 25-99 | 4 | 100-249 | 8 | 250-499 | 16 | 500+ | 24 |
| outstandings | <250 | 4 | 250-999 | 8 | 1,000-2,499 | 16 | 2,500+ | 32 | | |
| | | | | | | | | | | |
| FRA/IRS trans/month | <25 | 2 | 25-49 | 4 | 50-149 | 8 | 150-299 | 16 | 300+ | 24 |
| outstandings | <75 | 1 | 75-149 | 2 | 150-449 | 4 | 450-899 | 8 | 900+ | 12 |
| | | | | | | | | | | |
| F&O trans/month | <25 | 2 | 25-49 | 4 | 50-149 | 8 | 150-299 | 16 | 300+ | 24 |
| outstandings | <75 | 1 | 75-149 | 2 | 150-449 | 4 | 450-899 | 8 | 900+ | 24 |
| | | | | | | | | | | |
| Securities trans/day | <10 | 2 | 10-34 | 4 | 35-99 | 8 | 100-199 | 16 | 200+ | 24 |
| outstandings | <199 | 2 | 200-999 | 4 | 1,000-4,999 | 8 | 5,000-9,999 | 16 | 10,000+ | 24 |
| | | | | | | | | | | |
| FT payments/day | <25 | 2 | 25-49 | 4 | 50-199 | 8 | 200-399 | 16 | 400+ | 24 |
| | | | | | | | | | | |
| Retail accounts | <500 | 4 | 500-2,499 | 8 | 2,500-4,999 | 16 | 5,000+ | 32 | | |
| | | | | | | | | | | |
| Private Banking clients | <500 | 4 | 500-2,499 | 8 | 2,500-4,999 | 16 | 5,000+ | 32 | | |
| | | | | | | | | | | |
| Trade Finance/month | | | | | | | | | | |
| - Letters of Credit | <100 | 2 | 100-499 | 4 | 500-999 | 8 | 1,000-1,999 | 16 | 2,000+ | 24 |
| - Collections | <100 | 1 | 100-499 | 2 | 500-999 | 4 | 1,000-1,999 | 8 | 2,000+ | 12 |
| - Reimbursements | <500 | 2 | 500-2,999 | 4 | 3,000+ | 8 | | | | |
| - Bankers Acceptances | <100 | 1 | 100-399 | 2 | 400-799 | 4 | 800-1,599 | 8 | 1,600+ | 12 |
| - Bills Finance | <100 | 1 | 100-399 | 2 | 400-799 | 4 | 800-1,599 | 8 | 1,600+ | 12 |

Business areas not used do not score.

Any local products processing transactions should be equated to the closest corresponding core business area for scoring.

Page 1
MKIPM/1296

# Midas-Kapiti
### I N T E R N A T I O N A L

Notes

1.  Loan transactions which count are:
    - demand loans
    - term loans
    - discounted loans
    - participations purchased/sold
    - guarantees issued.

2.  Negotiable Assets sold do not score.

3.  Negotiable Assets purchased to be included in Money Market or Securities, as applicable.

4.  Letters of Credit includes Imports, Exports, Standbys and Negotiations.

5.  Collections includes opening of Incoming and Outgoing.

6.  Reimbursements include Authorizations and Claims. Less than 500 would not justify automation.

7.  Bills Finance volumes are estimated based on Bankers Acceptances.

| OVERALL SCORE | | |
|---|---|---|
| 100 - 140 | - | Category 4 |
| 40 - 100 | - | Category 3 |
| 25 - 39 | - | Category 2 |
| <25 | | Category 1 or Midas First |

## PROCEDURES FOR REVISING VBP CATEGORY

The Client's business transaction volumes will be checked annually. If the average daily business transaction volumes are calculated to be above the buffer zone (or 25% more than the lower limit of the next VBP category) then they will be rechecked three (3) months later. If the average daily business transaction volumes are above the buffer zone for a second consecutive time the VBP category will be revised upwards and the Client will be liable to pay an upgrade license fee three months after the date of the second check. Notice of the possible requirement to pay an upgrade fee will be given to the Client after the first business transaction volume check exceeds the buffer zone. No such initial check of the Client's business transaction volumes will be made until after the expiration of twelve (12) months from the License Date. If the average daily business transaction volumes exceed an overall score of 140 the Client will be liable to pay an upgrade license in accordance with the standard fees of the Company.