# Exhibit 3

**Midas-Kapiti**
INTERNATIONAL

**VARIATION AGREEMENT**
**PAGE 1**

AGREEMENT VNYC970018 made on the ___22___ day of August 1997 by and between

Midas-Kapiti International Inc.("the Company"), a Delaware corporation, having its

principal place of business at 45 Broadway, New York, N.Y. 10006,

and

The Northern Trust Company ("the Client") a corporation, having its principal place of

business at 50 South LaSalle Street, Chicago, Illinois 60675

---

**RECITAL:**

The Company and the Client have agreed to vary the General Terms of Trading Agreement
Number GNYC970018, License Agreement Number LNYC970018 and Consultancy Agreement
Number CNYC970018 between them dated___22___day of August 1997 if and as modified
and/or as varied prior to the date hereof (together the "Original Agreement") on the terms set out
herein.

IN CONSIDERATION of the Company and the Client agreeing to be bound by the Original
Agreement as varied hereby, it is HEREBY AGREED as follows:

**TERMS:**

1       Terms defined in the Original Agreement shall, except as specifically set out in the
        Variations hereto (or where the context otherwise requires), bear the same meanings
        herein as are therein ascribed to them.

2       The terms of the Original Agreement shall with effect from the date hereof be varied
        as set out in the Variations hereto.

3       The Original Agreement shall, as varied hereby, remain in full force and effect and
        the terms herein set out shall operate as variations, modifications or waivers (as
        appropriate) permitted by and in accordance with the provisions of the Original
        Agreement.

MKIVA/1196

**Midas-Kapiti**
I N T E R N A T I O N A L

| VARIATIONS TO GENERAL TERMS OF TRADING |
|---|

Clause 4.1 to read as follows:

**"For purposes of this Agreement, Confidential Information shall mean all
tangible and intangible information including without limitation, designs,
flowcharts, plans, product and component drawings, specifications, manuals,
supplier lists, customer lists, customer data, cost and price data, marketing
information and other data and information relating to the existing or planned
business, software or data processing systems of either party or any other
confidential information or trade secrets respecting the business affairs or
property of either party which are disclosed to the other party ("the Recipient")
pursuant to these General Terms or any specific Agreement. The recipient shall
treat such Confidential Information with at least as great a degree of care as it
uses for its own Confidential Information. The Recipient agrees not to sell,
transfer, publish, disclose, display or otherwise make available to others, nor to
use any Confidential Information except for the purposes contemplated
hereunder unless first obtaining the other party's written consent."**

Clause 4.3 to read as follows:

"The Client shall ensure that all persons to whom Products or parts thereof are
disclosed are made aware prior to disclosure that the Products are confidential and
shall ensure that no copies are made other than as permitted by these General Terms
or a specific Agreement **or by law**."

Clause 6.1 to read as follows:

**"Provided the Company has submitted invoices to the Client for fees owing to
the Company** the Client shall pay to the Company the fees (without offset or
deduction) upon the due dates and in the currency of payment all as set out in any
specific Agreement together with any amounts referred to in sub-clauses 6.2 and 6.3
hereof. All payments shall be made to the Company at the address shown herein or
as notified by the Company to the Client from time to time."

Clause 7.1 to read as follows:

"The Client shall provide to the Company such assistance, facilities and services as
may be **reasonably** necessary to enable the Company to fulfil its obligations under
any specific Agreement. This assistance shall include (but not be limited to)
provision of and access to information, data, accommodation, computing resources,
appropriate Client employees and a safe working environment, whether within or
outside the Client's normal office hours."

MKIVA/1196



**Midas-Kapiti**
INTERNATIONAL

VARIATION AGREEMENT
PAGE 3

---

**VARIATIONS TO GENERAL TERMS OF TRADING**

---

Clause 7.3 to read as follows:

> "Prior to the supply of Products or Services, the Client shall supply to the Company a copy of all rules and regulations relating to the conduct of the Client's employees and of specific regulations or practices **(including without limitation policies regarding confidential information)** with which the Company's personnel should comply.  The Company's personnel shall endeavour to comply with such rules and regulations whenever they are on the Client's premises."

Clause 8 to read as follows:

> **"Subject to prior written notice, if an employee of either party (actively connected with the implementation of the System which is the subject of the Agreement), is induced or allowed to enter the service of or commence employment with the other party within 12 months of completion of the individual's implementation assignment, the party engaging the employee will pay the other party an amount equal to 12 months cost of employing such employee. This does not in any way restrict the right of any employee to freely accept employment and change employment. The parties agree that such payment is a fair, reasonable, negotiated and agreed, equitable sum. This is in recognition of the disruption that such inducement would cause to the efficient conduct of the original employer's business, the exact cost of such disruption being otherwise impossible to determine."**

Clause 9.1 a to read as follows:

> "any amount **validly** due to the Company remains due and unpaid for 30 days or more after the Company has given notice to the Client that any such amount is overdue for payment (provided that any such amount is in fact overdue);"

**A new clause called Clause 9.3 to be added:**

> **"The Client shall be entitled by notice in writing, without prejudice to any of its rights herein or under any Specific Agreement, to terminate forthwith any Specific Agreement if the Company is in breach of any of the terms of any Specific Agreement or these General Terms and within 90 days of dispatch to the Company of a request to rectify the breach complained of, fails fully to rectify such breach."**

MKIVA/1196

**Midas-Kapiti**
INTERNATIONAL

---

## VARIATIONS TO GENERAL TERMS OF TRADING

Clause 10 to read as follows:

"Neither party hereto will be liable for delay or for failure to perform its obligations if and to the extent such delay or failure results from circumstances beyond its control, but any such circumstances shall not relieve the Client from its obligations to pay for any Products or Services supplied to it prior to such circumstances, **if the Product or Service constitutes a complete Product or Service."**

**A new clause called Clause 11.1 to be added:**

**"If the ownership of the Client changes, then the Client's License shall not be affected provided that the entity which licensed the System remains in existence. If the legal structure of the Client is changed and a new company is created then the new company will not have the right to use the System without the Company's consent which shall not be unreasonably withheld."**

## VARIATIONS TO LICENSE AGREEMENT

Clause 1.2 definitions of "System" and "Documentation" to read as follows:

"System: The computer object programs, procedure statements, screen layouts and definitions and Documentation for the software products listed in the Schedule **and including all Maintenance Releases accepted by the Client."**

"Documentation: The manuals which describe the functions and operation of the System and which are listed in the Schedule. **Documentation shall also include the functional specifications and all user documentation for all Maintenance Releases accepted by the Client."**

MKIVA/1196



**Midas-Kapiti**
INTERNATIONAL

| VARIATIONS TO LICENSE AGREEMENT |
|---|

Clause 2.1 to read as follows:

"The Company hereby grants to the Client the right to use the System upon the Environment at the Location which right shall be non-exclusive and the Client shall not directly or indirectly sell, lease, license, assign, transfer or otherwise encumber the System or any modified form of the System or any part thereof. The Client shall only use the System or any modified form of the System upon the Environment and at the Location and for the processing of its own data for its own internal business purposes and shall not use the System or any part thereof directly or indirectly as a data processing service bureau for any third party. **The Client may use the System for processing the data of any United States, Canadian, United Kingdom and Hong Kong company which is a subsidiary (>51% owned) of The Northern Trust Company, subject to such use being in accordance with the terms of the Schedule."**

Clause 2.2 to read as follows:

"The Company shall have the right, at any time and from time to time, to audit the Client's use of the System in order to assure compliance with the terms of this Agreement and upon request by the Company, the Client shall give full co-operation to the Company in carrying out such audit**, provided that the Company complies with the reasonable policies of the Client from time to time relating to confidentiality of data and office system security and the Company grants the Client an indemnity against any breach of such policies."**

**A new clause called Clause 2.3 to be added:**

**"2.3  Back-up Site**

**If the Client wishes to make arrangements for contingency back-up facilities (hereinafter referred to as the Back-up Site) involving the Use of the System, prior written permission shall be obtained from the Company by the Client; such permission shall not be unreasonably withheld, subject to the Back-up Site or its controlling organisation not being deemed, at the sole discretion of the Company, to be in any way competitive with the Company. In the event of an occurrence at the Location which prevents the Client Use of the System upon the Equipment, then the Client shall be permitted by the Company to commence Use of the System at the Back-up Site and shall notify the Company of such Use within twenty four (24) hours of said event.**



**Midas-Kapiti**
INTERNATIONAL

---

**VARIATIONS TO LICENSE AGREEMENT**

---

Installation of the System at said Back-up Site shall be executed by the Client in accordance with the Company's standard installation instructions prevailing at the time. Additionally, the Use of the System by the Client at said Back-up Site shall be governed at all times by the terms and conditions of this Agreement.

Furthermore, while the System is being used at the Back-up Site the Client agrees that during this period the Client shall work diligently to restore the facilities required to operate System at the Location. At any time during the above defined back-up arrangement, when the System is being used at both the Location and the Back-up Site, the Client warrants that such overlap period shall be kept to the minimum necessary to be determined by the Company at its sole discretion.

In addition, the Company grants to the Client the right to Use the System at the Back-up Site for a period not exceeding thirty (30) days per annum for the purposes of rehearsing and testing the Client's recovery procedures."

A new clause called Clause 2.4 to be added:

" The Company will provide another copy of the Licensed software at no charge except for those incurred in its preparation and distribution should the original copy be lost or damaged."

Clause 3 to read as follows:

"This Agreement shall commence on the date of this Agreement and shall **be perpetual** unless terminated earlier in accordance with the terms hereof or the General Terms."

Clause 6.1 to read as follows:

"The Recurring Fees specified in the Schedule are fixed for twelve months from the date of this Agreement. Thereafter, the Company shall have the right to substitute for them its then standard fees, **which shall be increased annually by no more than the then current U.S. Consumer Price Index plus maximum 2%** and the Client hereby agrees to pay same."



**Midas-Kapiti**
INTERNATIONAL

---

**VARIATIONS TO LICENSE AGREEMENT**

---

Clause 7 to read as follows:

"THE COMPANY WARRANTS THAT THE SYSTEM PERFORMS IN ALL MATERIAL RESPECTS IN ACCORDANCE WITH THE DOCUMENTATION BUT NO WARRANTY IS GIVEN OR IMPLIED AS TO THE SUITABILITY OF THE SYSTEM FOR ANY PARTICULAR PURPOSE OR FOR THE CLIENT'S PARTICULAR BUSINESS **THE COMPANY FURTHER WARRANTS THAT THE SYSTEM IS CAPABLE OF HANDLING THE YEAR 2000 DATE CHANGE AND THAT THE SOFTWARE FALLING WITHIN THE SCOPE OF THIS AGREEMENT WILL FUNCTION AND PERFORM CORRECTLY IN THE YEAR 2000 AND THEREAFTER WITHOUT MATERIALLY DIMINISHING THE OVERALL FUNCTIONALITY AND. PERFORMANCE OF THE SYSTEM.**"

Clause 8 to read as follows:

"The Company shall procure the delivery of the System to the Client. Upon delivery the Client shall perform an acceptance test upon the System and such acceptance test shall be deemed to have been successfully completed and the System shall be deemed to have been accepted upon expiration of thirty (30) days after the delivery of the System unless the Client during such 30 day period has notified the Company, in writing, of failures to meet and perform tasks specified in the Documentation together with full details of the nature of said failures. In such event, the acceptance test shall be deemed successfully completed when the Company has overcome the failures so notified by the Client, **provided that the failures have been rectified such that the System performs in accordance with the Documentation in accordance with the terms of Clause 7 herein.** In any event, the System shall be deemed to have been accepted when the Client has processed any data with the System or any part thereof other than data specifically submitted for the purpose of acceptance testing or has used or relied upon the output of the System for the conduct of its business, whichever first occurs."

Clause 9.1 to read as follows:

"The Company will (provided no **validly due** sums are outstanding and due to the Company) provide to the Client a maintenance service as defined in sub-clauses 9.2, 9.3 and 9.4 throughout the period of this Agreement commencing from the date of acceptance as defined in clause 8."

MKIVA/1196

**Midas-Kapiti**
INTERNATIONAL

| VARIATIONS TO LICENSE AGREEMENT |
|---|

Clause 9.3 to read as follows:

"The Company may produce Maintenance Releases from time to time and such new Maintenance Releases will be supplied to the Client at no additional fee. The parties hereto shall agree a delivery date for a new Maintenance Release, which date shall be no later than six months from notification to the Client of its availability. The Client shall test and install the Maintenance Release within **60 days** of its delivery to the Client."

**A new clause called Clause 9.6 to be added:**

"**From the tenth anniversary of the date of signing of this Agreement, the Company shall be entitled to terminate Maintenance Services with twelve (12) months notice in writing to the Client if the Client has operated on a non-current version of the System for more than five (5) years following the first delivery of the last maintenance release on that System.**

**If the Company invokes this clause, then the Client will have the option to license source code provided that no sums of money are owing to the Company. The initial License Fee for source code will be five (5) times the then current Recurring Fees, and no further Recurring Fees will be payable. The use of source code will be restricted to licensed sites only based on the terms of the Agreement. Additionally, the Company will give the Client the right to initiate the cancellation of Recurring Fees payments and the licensing of source code under the same criteria.**"

**A new clause called Clause 13 to be added:**

"**The Company undertakes to enter into a Supplemental License Agreement with the Client to extend this Agreement to remote sites in the United States (including Chicago), Toronto and Hong Kong, processing live transactions via a regional hub site in Chicago, Illinois on the terms and conditions set out in the Supplemental License Agreements attached.**

**If the Client does not sign one of these Supplemental License Agreements by January 31, 1998 the fees will be increased to the Company's current commercial terms at the date when a Supplemental License Agreement is signed by both parties.**"

MKIVA/1196

**Midas-Kapiti**
INTERNATIONAL

---

┌─────────────────────────────────────────────────────┐
│ **VARIATIONS TO CONSULTANCY AGREEMENT**               │
└─────────────────────────────────────────────────────┘

**A new clause called Clause 5 to be added:**

**"Clause 5.  Copyright**

**The Client shall inform the Company promptly of any unauthorised use of the Materials or any infringement of the copyright or know-how and other proprietary rights relating to the Materials which shall come to its knowledge and shall at the Company's expense provide the Company with all reasonable assistance in any suit for injunction or relief or damages which the Company may, at its sole discretion, decide to take in respect of such infringement or unauthorised use.  The Company will at its own cost defend any action brought against the Client based upon a claim that the Materials infringe a patent or copyright of a third party and will pay the amount of any settlement or the costs and damages awarded including reasonable legal fees (if any) in such action provided.**

**a)   that the Company is notified promptly in writing of any notice of claim or threatened or actual action and details thereof and**

**b)   that at the Company's request and expense the Company is given full co-operation by the Client for the defence by the Company in its own or in the Client's name of the claim or action."**

---

IN WITNESS WHEREOF, the parties have, by their duly authorized representatives, executed this Agreement as at the date first before written.

SIGNED on behalf of the COMPANY and thereby duly authorized:

SIGNATURE _Richard Rosenthal_

FULL NAME  Richard Rosenthal

POSITION     Executive Vice President
                    and Branch Manager

SIGNED on behalf of the CLIENT and thereby duly authorized:

SIGNATURE _Peter A May_

FULL NAME  PETER MAGRINI

POSITION  Senior Vice President