# Exhibit 4

# MISYS Ⓜ

**Log Number:** 25529

**Client File:** The Northern Trust Co

**Licence Version:** SLA Version 4/5NONUSAUTO ✓

**Agreement Nos:** Supplental License Agreement ON16427 ✓

**Opportunity No:** ON16427    **Approval Status?** Approved

**Comm Manager**

**Contracting Parties:**

The Northern Trust Company ✓

Misys International Banking Systems Inc {US}

**Supplemental Licence Information**

**Original Log No:** 7065    **Term** P    **Exp Date**

**Original Date:** 22 August 1997

**Original Agmt Nos:** GNYC970018, VNYC970018 , LNYC970018, CNYC970018 , MNYC970018

**Contract Term:**    **Expiry Date:**

**Jurisdiction:**

**Date of Contract:** 20 October 2009 ✓

**Date Received:** 30 October 2009 ✓

**Date Effective:** 20 October 2009 ✓

**Contract Type:** Additional Product ✓

**Client Site:** Various ✓

**Products:** Midas ✓

**Total Value:** USD 46,250 ✓

**Product Value:** USD 46,250 ✓

**Sales Branch:** New York ✓

**Division:** CO    **Salesperson:** Ilana Altman

| Commercial Operations Only | | | |
|---|---|---|---|
| Ready for Circulation | ☐ | Initials | ☐ TV to Authorise |
| File Copy | ☐ | Date | ☐ |
| Database Officer Copy | ☐ | | |

30/10/2009 17:02:19 niharris

# SUPPLEMENTAL LICENSE AGREEMENT

AGREEMENT Number ON16427 shall become effective upon the date of the latest signature hereto as set out below in the attestation clause (the "**Effective Date**")

## BETWEEN

**Misys International Banking Systems Inc.**, whose address is 1180 Avenue of the Americas, New York, NY 10036 (hereinafter referred to as "**Company**");

and

**The Northern Trust Company**, whose address is 50 South LaSalle Street, Chicago, IL 60675 (hereinafter referred to as the "**Client**"),

hereinafter individually referred to as "**Party**" and collectively as the "**Parties**"

## RECITAL:

The Company and the Client have agreed to vary the Agreement Number LNYC970018 between them. It is now hereby agreed as follows:

## TERMS:

1.0 The Company and the Client have agreed to vary the Agreement Number LNYC970018 between them dated 22nd August 1997 if and as varied prior to the date hereof by any other agreement (together the "**Original Agreement**") on the terms set out herein with effect from the Effective Date of this Supplemental License Agreement. In all other respects the Original Agreement remains unchanged and in the event of any conflict between the Original Agreement and this Supplemental License Agreement then the terms of this Supplemental License Agreement shall take precedence and govern.

2.0 Nothing in this Supplemental License Agreement and/or the Original Agreement shall limit or exclude the Company's liability:
   (i)   for fraud
   (ii)  wilful default;
   (iii) for death or personal injury resulting from negligence; or
   (iv)  to the extent not permitted by law.

3.0 Except as provided in clause 2.0 above and subject to clause 4.0 below, should the Company be found liable for loss or damage to the Client whether in contract (by way of indemnity or otherwise), tort including negligence, restitution or otherwise arising out of or in connection with any breach of the Company's obligations under this Supplemental License Agreement (but not otherwise) then the Company's total liability in respect of such loss or damage arising shall not in any circumstances in aggregate exceed:
   (i)   In respect of any liability arising other than in connection with the provision of or failure to provide maintenance services, 115% (one hundred and fifteen percent) of the total Initial License Fee payable by the Client under this Supplemental License Agreement; or
   (ii)  in respect of liability arising in connection with the provision of or failure to provide maintenance services, 115% (one hundred and fifteen percent) of the Recurring License Fees paid in the Year preceding the first date on which the loss or damage arose; or
   (iii) $25,000,
   whichever is the greatest.

4.0 THE COMPANY WILL HAVE NO LIABILITY UNDER OR IN CONNECTION WITH THIS SUPPLEMENTAL LICENSE AGREEMENT (SUBJECT TO CLAUSE 2.0 ABOVE) AND/OR THE ORIGINAL AGREEMENT IN RESPECT OF:
   (i)   LOSS OF PROFITS, LOSS OF BUSINESS, LOSS OF REVENUE, LOSS OF CONTRACTS, LOSS OF GOODWILL, LOSS OF ANTICIPATED EARNINGS OR SAVINGS (WHETHER DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL); OR
   (ii)  LOSS OF USE OR VALUE OR DAMAGE OF ANY DATA OR EQUIPMENT (INCLUDING SOFTWARE), WASTED MANAGEMENT, OPERATION OR OTHER TIME (WHETHER DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL); OR
   (iii) ANY SPECIAL, INDIRECT, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS,
   HOWSOEVER ARISING.

5.0 All and any rights, including intellectual property and industrial property rights, discovered, created or established in any form whatsoever, by or in association with the Company or Client pursuant to the Original Agreement and this Supplemental License Agreement shall vest absolutely and in their entirety in the Company.

6.0 The System (including underlying software and technology) and services provided pursuant to this Supplemental License Agreement (collectively, "**Items**") may be subject to export control and import laws and regulations of the United States, the European Union and its member states and other countries (collectively, "**Export/Import Law**"). Client agrees to comply strictly with all Export/Import Law applicable to the Items, and assumes sole responsibility for obtaining licenses and other authorisations that are required under Export/Import Law to deliver and use the Items pursuant to this agreement.

7.0 The Company may provide notice of not less than six months of the discontinuance of the System software and during said notice period the Parties shall agree in writing an extended maintenance Services agreement. Failing agreement as aforesaid, on the 1st January following the expiry of such notice of discontinuance, the Company's obligation to supply any maintenance Services for the System or part thereof shall cease.

IN WITNESS whereof the Parties have by their duly authorised representatives executed this Supplemental License Agreement as at the dates below written.

SIGNED on behalf of the Company and thereby duly authorised:

_____
SIGNATURE

Richard Jalk
FULL NAME

Regional Sales Director, Americas
POSITION

October 20, 2009
DATE

SIGNED on behalf of the Client and thereby duly authorised:

_____
SIGNATURE

PATRICIA   M.   TOLER
FULL NAME

Vice President
POSITION

October 16, 2009
DATE

# SCHEDULE
**THE FOLLOWING SCHEDULE IS TO BE ADDED TO THE ORIGINAL AGREEMENT**

**LOCATION OF INSTALLATION:**
- Midas Release 4                    Global Hub in Chicago, Illinois

**LOCATION(s) OF USE:**
- Midas Release 4                    Chicago, London, Toronto, Dublin and Singapore.

Licensed hereby to use Midas Release 4 remotely running from the Chicago Hub for up to ten (10) additional sites (each, an "Additional Site") for the modules licensed for London as of the date of this Variation Agreement. The volume of transactions processed on behalf of these additional ten (10) locations will count against and be limited by London's duly licensed overall Volume Based Pricing (VBP) Category. Client shall notify the Company of any location in advance of processing any transactions through the System on behalf of such location.

Licensed hereby to use Midas Release 4 remotely running from the Chicago Hub for up to fifteen (15) additional sites for the General Ledger and Core Platform modules only (each, a "General Ledger Site"). Only activity that is a result of or related to General Ledger expense recording activities may be processed.

**PRICE CATEGORY**

| Location of Use | Price Category |
|---|---|
| Chicago | VBP4 |
| London | VBP3 |
| Toronto | VBP1 |
| Singapore | VBP1 |
| Dublin | VBP1, subject to a maximum of 25 Foreign Exchange and Money Market Deals per month |

**PURPOSE OF USE:**
- Contemplated use:          Banking software for the financial service sector
- Production and testing:    Yes
- Cold Backup                Yes
- Hot Backup:                As provided in Clause 2.3 of the Original Agreement

**SYSTEM AND ENVIRONMENT**

| System | Price Category derived from the VBP matrices or based on licensed use as set out below |
|---|---|
| **System Software**<br><br>**Midas Release 4.04**<br>   SWIFT 2009 Changes - Midas R4.04 | As per Price Category Table above |

**Company System Software**

All System Software is Company System Software unless identified as being Third Party System Software

**Third Party System Software**

Third Party System Software and Company System Software which has a third party component is identified by the notation.** in the list of System Software above.

| Documentation: |
|---|
| **Midas Release 4.04**<br><br>   SWIFT 2009 Functional Description |

| Environment: | |
|---|---|
| Midas | See Exhibit 1 |

**FEES**

**(a)**    **Initial License Fee ("ILF") of USD 46,250.00 (Forty Six Thousand Two Hundred Fifty United States dollars)**

| System Software | |
|---|---|
| As listed above | • USD 46,250.00 of the ILF shall be paid by the Client to the Company on the Effective Date |

**(b)**    **Recurring License Fees ("RLF")**

An additional Recurring License Fee(s) of USD 8,326.00 (Eight Thousand Three Hundred Twenty Six United States dollars), as may be adjusted under the below terms, shall be due and payable by the Client to the Company in advance upon the 1st January of each calendar year following delivery.  A pro-rata amount shall become due upon the date of delivery of the System Software or part thereof calculated for the period from date of delivery until the 31st December/30th April of that calendar year. The Recurring License Fees specified herein shall be fixed for twelve months from the Effective Date. Thereafter, the Company shall have the right to apply its then standard annual percentage increase to the previous year's Recurring License Fees. Such increases will not exceed the then current U.S. Consumer Price Index plus a maximum of 2%.

## VBP

VBP categories applying to the Fees detailed herein and to the Original Agreement are set out in the matrix below

## APPENDIX A
## VOLUME BASED PRICING MATRIX
## MIDAS

| Business Area | | Vol | Score | Vol | Score | Vol | Score | Vol | Score | Vol | Score | Vol | Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FX | trans/day | <50 | 2 | 50-199 | 4 | 200-499 | 8 | 500-999 | 16 | 1,000-2,500 | 24 | +2,500 | +2 |
| | outstandings | <150 | 1 | 150-499 | 2 | 500-1,499 | 4 | 1,500-2,999 | 8 | 3,000-7,500 | 12 | +7,500 | +1 |
| MM | trans/day | <10 | 2 | 10-29 | 4 | 30-99 | 8 | 100-199 | 16 | 200-500 | 24 | +500 | +2 |
| | outstandings | <300 | 1 | 300-1,199 | 2 | 1,200-2,499 | 4 | 2,500-4,999 | 8 | 5,000-12,500 | 12 | +12,500 | +1 |
| Loans | trans/month | <25 | 2 | 25-99 | 4 | 100-249 | 8 | 250-499 | 16 | 500-1,250 | 24 | +1,250 | +2 |
| | outstandings | <250 | 4 | 250-999 | 8 | 1,000-2,499 | 16 | 2,500-6,000 | 32 | | | +6,000 | +3 |
| FRA/IRS | trans/month | <25 | 2 | 25-49 | 4 | 50-149 | 8 | 150-299 | 16 | 300-750 | 24 | +750 | +2 |
| | outstandings | <75 | 1 | 75-149 | 2 | 150-449 | 4 | 450-899 | 8 | 900-2,000 | 12 | +2,000 | +1 |
| F&O | trans/month | <25 | 2 | 25-49 | 4 | 50-149 | 8 | 150-299 | 16 | 300-750 | 24 | +750 | +2 |
| | outstandings | <75 | 1 | 75-149 | 2 | 150-449 | 4 | 450-899 | 8 | 900-2,000 | 24 | +2,000 | +2 |
| Securities | trans/day | <10 | 2 | 10-34 | 4 | 35-99 | 8 | 100-199 | 16 | 200-500 | 24 | +500 | +2 |
| | outstandings | <199 | 2 | 200-999 | 4 | 1,000-4,999 | 8 | 5,000-9,999 | 16 | 10,000-25,000 | 24 | +25,000 | +2 |
| FT payments/day | | <25 | 2 | 25-49 | 4 | 50-199 | 8 | 200-399 | 16 | 400-1,000 | 24 | +1,000 | +2 |
| Retail accounts | | <5,000 | 5 | 5,000-25,000 | 10 | 25,001-50,000 | 20 | 50,001-75,000 | 30 | 75,001-200,000 | 40 | +200,000 | +5 |
| Private Banking Clients | | <500 | 4 | 500-2,500 | 8 | 2,500-5,000 | 16 | 5,000+ | 32 | 12,500 | | +12,500 | +3 |

Business areas not used do not score.

Any local products processing transactions should be equated to the closest corresponding core business area for scoring.

## NOTES

Loan transactions which count are:
demand loans
term loans
discounted loans
participations purchased/sold
guarantees issued

Negotiable Assets sold do not score.

Negotiable Assets purchased to be included in Money Market or Securities, as applicable.

**Overall Score**

Above 320, add 1 to VBP category per 60 points
260 - 320 Category 7
200 - 259 Category 6
141 - 199 Category 5
100 - 140 Category 4
40 - 99             Category 3
25 - 39            Category 2
<25               Category 1

OR:

Midas First, if the following conditions are met:
Limited number of users <10
No scores in matrix column 3 or above

## PROCEDURES FOR REVISING VBP CATEGORIES

Volume Based Pricing (VBP) is based on a broad measure of business volumes used by the Client. The Client's business volumes are checked annually commencing 12 months after the date of this Agreement.

If the business volumes for the month prior to the date of the audit yield a score which is above the current VBP category, the VBP category will be revised upwards and the Client will be liable to pay an upgrade fee in accordance with the Payments clause of the License Agreement.

## EXHIBIT 1
## Midas
## Technical Environment Requirements

These are the <u>minimum</u> requirements for Midas R4, both mandatory and optional components. It does not define which specific configuration options apply for this contract.

### Mandatory Components

| IBM iSeries | |
|---|---|
| Hardware | Software |
| • iSeries size should be determined separately using the rules for sizing a Midas system<br>• Ethernet or Token Ring network connections. | • OS/400 V5R2M0 or higher.<br>• SEAGULL License and Message Server software with an Authorisation Code for an appropriate number of users.<br>• Appropriate router software e.g. Telnet daemon installed and running. |

| HARDWARE | Workstation | |
|---|---|---|
| Processor | Pentium 586 300MHz | |
| RAM | 128Mb | |
| Hard Disk | 300 Mb free disk space | |
| Monitor / Graphics card | Colour SVGA monitor | |
| Other | An Ethernet or Token Ring network connection to the host iSeries. | |
| SOFTWARE | | |
| Operating System | Windows 2000 or 2003 | |
| Database | | |
| Other | Router | TCP/IP is the preferred router and is supported on Windows 2000 and 2003 workstations.<br>Other supported routers include SNA Server. For a full list, consult the JW9RT.HLP file supplied with the J Walk Windows Client. |
| | Emulator | J Walk Windows Client internal emulator is the preferred emulator.<br>Other emulators are also supported. For a full list, consult the JW9RT.HLP file supplied with the J Walk Windows Client. |
| | | Internet Information Server 4.0 or 5.0 (if implementing e-Midas). |

### Optional Components

| HARDWARE | Network Server | |
|---|---|---|
| Processor | Pentium 586 300MHz | |
| RAM | 128Mb | |
| Hard Disk | 300 Mb free disk space | |
| Monitor / Graphics card | SVGA monitor | |
| Other | An Ethernet or Token Ring network connection to the host iSeries. | |
| SOFTWARE | | |
| Operating System | Windows 2000 or 2003 | |
| Database | | |
| Other | Router | TCP/IP is the preferred router and is supported on Windows 2000 and 2003 workstations.<br>Other supported routers include SNA Server. For a full list, consult the JW9RT.HLP file supplied with the J Walk Windows Client. |
| | Emulator | J Walk Windows Client internal emulator is the preferred emulator.<br>Other emulators are also supported. For a full list, consult the JW9RT.HLP file supplied with the J Walk Windows Client. |

**Notes**

- The Company reserves the right to modify these hardware, software, and architecture requirements at any time at its sole discretion. The Company will give the Client 90 days notice of any such modifications.
- The Client must enter into appropriate license and maintenance service agreements direct with the owners or distributors of required components not provided by the Company. The Company makes no representations and accepts no liability for such products nor any of the services linked to them.
- All PCs should have a keyboard, a mouse and a network card.