# Exhibit 6

# SUPPLEMENTAL LICENSE AND AMENDMENT AGREEMENT
## CONTRACT NUMBER ON75701

This Supplemental License and Amendment Agreement Number ON75701 (this "**Agreement**") shall become effective upon the date of the latest signature hereto as set out below in the attestation clause (the "**Effective Date**")

### BETWEEN

**Misys International Banking Systems Inc.**, whose address is 1180 Avenue of the Americas, New York, NY 10036 (hereinafter referred to as "**Company**");

and

**The Northern Trust Company**, whose address is 50 South LaSalle Street, Chicago, IL 60675 (hereinafter referred to as the "**Client**"), (hereinafter referred to as the "**Client**"),

hereinafter individually referred to as "**Party**" and collectively as the "**Parties**"

### RECITALS:

A. Company and Client entered into a License Agreement No. LNYC970018 dated August 22, 1997 if and as varied prior to the date hereof by any other agreement (the "**License Agreement**") and General Terms of Trading No. GNYC970018 dated August 22, 1997 if and as varied prior to the date hereof by any other agreement (the "**GTT**"), pursuant to which Company granted Client a right to use the System.

B. Client desires to license from Company the FATCA module (the "**FATCA Module**") which is part of the System, and Company desires to license to Client the FATCA Module, the details of which (including the fees payable for such license) are set out in the Schedule to this Agreement.

C. In addition, the Parties wish to amend the License Agreement and the GTT as set out in this Agreement.

### TERMS:

#### 1.0 DEFINITIONS

In this Agreement all capitalized terms not otherwise defined in this Agreement shall have the same meaning as set out in the License Agreement or the GTT.

#### 2.0 LICENSE OF THE FATCA MODULE

In consideration of the Client paying the Initial License Fee and the Recurring License Fees set out in the Schedule to this Agreement, Company hereby grants to Client a perpetual license to use the FATCA Module exclusively as part of the System on the same terms and subject to the same conditions as the System is licensed to Client pursuant to the License Agreement and the GTT (both as amended by this Agreement), including, without limitation, clause 2 of the License Agreement.

#### 3.0 AMENDMENTS TO LICENSE AGREEMENT AND GTT

3.1     Clause 3.3 of the GTT is hereby deleted in its entirety and replaced with the following:

Should the Company be found liable for loss or damage to the Client whether in contract (by way of indemnity or otherwise), tort including negligence, restitution or otherwise arising out of or in connection with any breach of the Company's obligations under or in connection with any Specific Agreement, then the Company's total liability in respect of such loss or damage arising shall not in any circumstances in aggregate exceed:
(i)    in respect of any liability arising other than in connection with the provision of or failure to provide maintenance services, 115% (one hundred and fifteen percent) of the total Initial License Fees actually paid by the Client under the Specific Agreement to which the liability arose; or
(ii)    in respect of liability arising in connection with the provision of or failure to provide maintenance services, 115% (one hundred and fifteen percent) of the Recurring License Fees actually paid by the

Client in the 12-months preceding the first date on which the loss or damage arose; or
(iii)    USD $25,000,
whichever is the greatest.

3.2     Clause 7 of the License Agreement is hereby deleted in its entirety and replaced with the following:

TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HAVE AGREED THE EXPRESS PROVISIONS OF THIS LICENSE AGREEMENT IN PLACE OF ALL WARRANTIES, CONDITIONS, UNDERTAKINGS, TERMS AND OBLIGATIONS CONCERNING THE RELEVANT TRANSACTION WHICH MIGHT OTHERWISE BE IMPLIED BY STATUTE, COMMON LAW, CUSTOM, TRADE USAGE, COURSE OF DEALING OR OTHERWISE (INCLUDING, FOR EXAMPLE, ANY IMPLIED TERM AS TO FITNESS FOR PURPOSE OR ANY IMPLIED WARRANTIES OF MERCHANTABILITY). COMPANY MAKES NO WARRANTY WITH RESPECT TO ANY THIRD PARTY SOFTWARE OR OPEN SOURCE SOFTWARE. CLIENT'S SOLE REMEDY WITH RESPECT TO SUCH THIRD PARTY SOFTWARE SHALL BE PURSUANT TO THE ORIGINAL LICENSOR'S WARRANTY, IF ANY, TO COMPANY, TO THE EXTENT PERMITTED BY THE ORIGINAL LICENSOR. THIRD PARTY SOFTWARE AND OPEN SOURCE SOFTWARE IS MADE AVAILABLE BY COMPANY ON AN "AS IS, AS AVAILABLE" BASIS.

3.3     Clause 2.1 of the License Agreement is hereby amended by adding the following sentence at the end of the clause:

All rights not expressly granted in this Agreement are reserved by Company and its licensors and Client acknowledges that the System is licensed and not sold.

3.4     The License Agreement is hereby amended by inserting the following clauses after clause 9.6:

9.7 Maintenance services are provided for the System, unless otherwise noted in the Schedule, provided

however that with respect to third party software, Company's obligation is limited to using commercially reasonable efforts to obtain maintenance from the third party owner of such software.

9.8 Client agrees to report all suspected failures of the System to perform tasks specified in the Documentation ("Error") and assistance requests through its designated Support Contact(s). Support Contact(s) are required to undergo Company's training courses prior to being confirmed as a "Support Contact". Such reports will include all pertinent information regarding Client's deployment and use of the System and the circumstances under which the alleged problem occurred. When submitting a service request, a Support Contact should have a baseline understanding of the problem encountered and an ability to reproduce the problem prior to making such service request in order to assist Company in diagnosing and triaging the problems.

9.9 The Company shall not be obliged to provide the maintenance services described in clauses 9.2, 9.3 and 9.4:

9.9.1 if the alleged Error has been caused by, or the ability to resolve the alleged Error is directly impacted by a modification made by someone other than the Company or one of its sub-contractors;
9.9.2 if the Client is not using the latest service pack or hot fix made available to Client;
9.9.3 in respect of any software deliverables unless explicitly agreed and priced in a Specific Agreement;
9.9.4 if the System is not being used in an appropriately configured and compatible operating environment;
9.9.5 if all elements of the operating environment have not been properly operated, supported and maintained by or on behalf of the Client;
9.9.6 if after using reasonable efforts, the Company has not been able to reproduce the alleged Error;
9.9.7 if the System has been used otherwise than in accordance with the Documentation and/or the provisions of the relevant Schedule; or
9.9.8 in respect of any period for which the Client has not paid Recurring License Fees.

9.10 The Client shall pay the Company for work undertaken in response to an alleged Error in the System which, upon investigation, does not fall within the scope of the maintenance services described in clause 9.2. Promptly upon discovery that the work does not fall within the scope of the services described in clause 9.2, Company shall cease work and submit a proposal to Client for any work required.

9.11 Except as set out in clause 9.2, the Company shall have no obligation to correct such Errors in prior versions of the System.

9.12 It is Client's responsibility to ensure that all appropriate users receive initial training services sufficient to enable Client to effectively use the System. Failure to do so could result in additional fees if service requests are deemed excessive as a result of insufficient training, at Company's discretion.

9.13 It is the intention of Client that at no time shall the Company access, hold or store in any form, or use for any purpose, actual Client or Client's customer production data whether primary or derived (the "Intention"). In furtherance of the Intention, Company

acknowledges Client's representation, and Client represents, that Client shall only grant Company access to test systems using test data. The Client further agrees to anonymise all data to which the Company might otherwise have access so far as is practicable by using tools such as software utilities.

3.5    The License Agreement is hereby amended by inserting the following at the end of the final paragraph of clause 10.3:

If neither of the options set out in (i) or (ii) above can be accomplished on reasonable terms for Company, the Company may require the Client by notice to stop using, un-install and destroy the affected item and, once this has been done, the Company shall refund a pro-rata proportion of the Initial License Fees (pursuant to the formula, below) paid for that affected item:

| | The Initial | | 1/60th of the said Initial |
|---|---|---|---|
| Value of Refund = | License Fees attributable to the affected item of the System | less | License Fees for each month since the effective date of the Supplemental License and Amendment Agreement Number ON75701 |

This clause 10 sets out the Company's entire obligations and liability and Client's sole and exclusive remedy in relation to any claim of infringement of intellectual property rights.

3.6    The License Agreement is hereby amended by inserting a new clause 10.4 as follows:

The Company shall have no obligation or liability under clause10.3 to the extent that any claim arises in or from any of the following:

a) use of the System or its Documentation in a manner not authorized by the relevant Schedule;
b) the use of the System or its Documentation in combination with items not provided by the Company;
c) open source software, where open source software is computer software with its source code licensed and made available to anyone; and/or
d) any modification of the System by someone other than the Company or its sub-contractors.

4.0 In the event of any inconsistency or conflict between the terms of the License Agreement, the GTT, any supplemental license agreements entered into between the Parties and any amendments to any of the foregoing documents and the amendments made to the License Agreement and the GTT pursuant to clause 3 of this Agreement, then the amendments made to the License Agreement and the GTT pursuant to clause 3 of this Agreement shall supersede, govern and prevail.

5.0 **MISCELLANEOUS**

5.1 No variation, modification or waiver of any provision of this Agreement shall in any event be of any force or effect unless the same shall be agreed in writing between the Parties and then such variation, modification, waiver or consent shall be effective only on the specific instance and for the purpose and to the extent for which made or given.

5.2 This Agreement may be entered into in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any Party

# Schedule

**LOCATION OF INSTALLATION:**

- Midas Release 4        Chicago, Illinois

**LOCATION(s) OF USE:**

- Midas Release 4        Worldwide

**PURPOSE OF USE:**

- Contemplated Use        As per the License Agreement.
- Production, Testing        As per the License Agreement.
- Cold Backup:        As per the License Agreement.
- Hot Backup:        As per the License Agreement.

**SYSTEM AND ENVIRONMENT**

| System | Price Category derived from the VBP matrices attached at Appendix A to Supplemental License Agreement Number ON30939 |
|---|---|
| **Midas Release 4**<br><br>FATCA Master<br>The following system functions are available: System Values, FATCA Classification Table, Country Code Table, Document Code Table, Customer Information, Joint Account Holders, Authority Holders, History of Customer Information, Customer List by US Indicia, Exception Management, Document Management, Account Review, Electronic Search Tool, Take on Tool, Audit Reports, FATCA Exception Report, Default Classification Report, Document Action Report, Account for Review Report | VBP10 |

| Documentation: |
|---|
| **Midas Release 4**<br><br>FATCA – Customer Identification and Classification (CGL132 – Master) |

| Environment: |
|---|
| As per License Agreement. |

**FEES**

(a) Initial Licence Fee ("ILF") for the FATCA Module of USD $ 263,250.00 (Two Hundred Sixty Three Thousand Two Hundred Fifty United States dollars), payable as follows:

- USD $ 131,625.00 shall be paid by the Client to the Company on the Effective Date; and
- the remaining USD $ 131,625.00 shall be paid by the Client to the Company on the date of delivery of the FATCA Module or any part thereof.

(b) Recurring Licence Fees ("RLF")

USD $ 52,650.00 (Fifty Two Thousand Six Hundred Fifty United States dollars), payable per annum from the Effective Date and subject to clause 6 of the License Agreement. The RLF set out herein is in addition to any other recurring license fees that the Client is paying prior to the Effective Date.

may enter into this Agreement by executing any such counterpart.

5.3 This Agreement shall constitute a binding amendment to the License Agreement and the GTT pursuant to clause 13.1 of the GTT.

5.4 This Agreement shall be governed by the laws of the state of New York and applicable Federal laws. The Parties hereby consent to the jurisdiction of the federal and state courts of the state of New York for the purpose of any action or proceeding brought by either Party in connection with this Agreement.

IN WITNESS whereof the Parties have by their duly authorized representatives executed this Agreement as at the dates below written.

SIGNED on behalf of the Company and thereby duly authorized:

SIGNATURE _____

FULL NAME *Richard Salk*

POSITION *President*

DATE *3/25/2014*

SIGNED on behalf of the Client and thereby duly authorized:

SIGNATURE _____

FULL NAME *Philip Jacobsen*

POSITION *VP, Procurement*

DATE *3/11/2014*